Giovanni Orantes, SBN 190060
**THE ORANTES LAW FIRM, P.C.**
3435 Wilshire Blvd., 27th Floor
Los Angeles, CA 90010
Telephone: (213) 389-4362
Facsimile: (877) 789-5776
go@gobklaw.com

Attorney for Plaintiffs Rosa Miriam Villalobos
and Martin Villalobos Orozco

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re<br><br>Byron Steve Valencia,<br>Debtor. | Case No. 1:23-bk-11227-MB<br><br>Chapter 13<br><br>Adv. Case No. 1:25-ap-01022MB |
| Rosa Miriam Villalobos and Martin Villalobos Orozco,<br>Plaintiffs,<br><br>vs.<br><br>BYRON STEVE VALENCIA, Debtor.,<br><br>Defendant. | **SECOND AMENDED COMPLAINT FOR NON-DISCHARGEABILITY OF DEBTS PURSUANT TO 11 U.S.C. §§ 523(a)(2) & 1328(a)(4)** |

Plaintiffs, the creditors Rosa Miriam Villalobos and Martin Villalobos Orozco (the "Creditors" or "Plaintiffs"), by their undersigned counsel, bring this Complaint to except the Debtor's debts to them from the discharge pursuant to 11 U.S.C. §§ 523(a)(2) and 1328(a)(4)

against Byron Steve Valencia ("Debtor" or "Defendant"). Plaintiff Rosa Miriam Villalobos Orozco individually will be referred to as Mrs. Villalobos.

**JURISDICTION**

1. This adversary proceeding is filed pursuant to Rule 7001(4) of the Federal Rules of Bankruptcy Procedure ("FRBP") to except the Plaintiffs' claims from the Debtor's discharge.

2. Plaintiffs, Creditors Rosa Miriam Villalobos and Martin Villalobos Orozco have standing to seek denial of the Debtor's discharge in this case pursuant to 11 U.S.C. §§ 523(a)(2) & 1328(a)(4)

3. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334.

4. This adversary proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(I) & (J). This Court has constitutional authority to enter a final judgment on these claims. Plaintiff consents to entry of final judgment and orders by the Bankruptcy Court.

5. Defendant, as the debtor in bankruptcy, has consented to entry of final judgment by the Bankruptcy Court.

6. Venue is proper in the Central District of California under 28 U.S.C. §§ 1408 and 1409(a), in that this action arises in and relates to the bankruptcy case pending in the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division, entitled *In re* Byron Steve Valencia, case number 1:23-bk-11227-MB (the "Bankruptcy Case").

**THE PARTIES**

7. Plaintiffs Rosa Miriam Villalobos and Martin Villalobos Orozco are married to each other and are residents of California.

8. Plaintiffs allege that Defendant is the debtor in his bankruptcy case and alleges that he maintains a principal place of residence at 21027 Bassett St., Canoga Park, CA 91303.

9. On information and belief, IVY GREEN CONSTRUCTION, INC., (hereinafter referred to as "IVY GREEN") is a stock corporation located at 16000 Ventura Blvd., PH 1203 Encino, CA 91436 and 16200 Ventura Blvd., Suite 317 Encino, CA 91436.

10. On information and belief, Defendant JAVIER VALENCIA (hereinafter referred to as "JAVIER") is an individual located at 16000 Ventura Blvd., PH 1203 Encino, CA 91436

and 16200 Ventura Blvd., Suite 317 Encino, CA 91436 employed by IVY GREEN and Defendant/Debtor.

11. At all relevant times, as alleged more fully herein, Defendant, IVY GREEN and JAVIER acted as an agent, servant, employee, co-conspirator, alter-ego and/or joint venturer of one another, and in doing the things alleged herein acted within the course and scope of such agency, employment, alter-ego and/or in furtherance of the joint venture. Each of the acts alleged herein were done with the permission and consent of each of the others, and, particularly, Defendant/Debtor.

12. At all times relevant hereto, Defendant, IVY GREEN and JAVIER were alter egos of each other and there existed, and at all times herein mentioned has existed, a unity of interest and ownership between the Defendant, IVY GREEN and JAVIER such that any separateness between them does not exist and Defendant completely controlled, dominated, managed, and operated IVY GREEN as an instrumentality that was designed to enable him to avoid personal liability for his intentional and unlawful actions in violation of the laws.

**ALTER EGO, AGENCY AND JOINT EMPLOYER**

**FOR DEFENDANT/DEBTOR AND IVY GREEN CONSTRUCTION, INC.**

**13.** Plaintiff is informed and believes, and based thereon allege, that there exists such a unity of interest and ownership between IVY GREEN and Debtor and that their individuality and separateness ceased to exist and they are one and the same in that, among other things:

14. Plaintiff is informed and believes, and based thereon alleges, that despite its alleged separateness or independence:

a. IVY GREEN is completely dominated and controlled by Debtor, who personally engaged in the transactions or committed the trespass and violated the laws as set forth in this complaint, who have hidden and currently hide behind IVY GREEN to perpetrate trespass, circumvent statutes, or accomplish some other wrongful or inequitable purpose.

b. Defendant/Debtor derives actual and significant monetary benefits by and through IVY GREEN's unlawful conduct as well as acts and omissions, and by using IVY GREEN as the funding source for his own personal expenditures.

c. Plaintiff is informed and believes that IVY GREEN and Defendant/Debtor, while really one and the same, were segregated to appear as though separate and distinct for purposes of perpetrating a trespass, circumventing a statute, or accomplishing some other wrongful or inequitable purpose.

d. Plaintiff is informed and believes that IVY GREEN, Defendant/Debtor and JAVIER do not comply with all requisite corporate formalities to maintain a legal and separate corporate existence of IVY GREEN, and IVY GREEN no longer maintains a separate corporate existence.

e. Plaintiffs are informed and believe, and based thereon alleges, that the business affairs of IVY GREEN and Defendant/Debtor are, and at all times relevant were, so mixed and intermingled that the same cannot reasonably be segregated, and the same are in inextricable confusion. IVY GREEN, is, and at all times relevant hereto was, used by Defendant/Debtor as a mere shell and conduit for the conduct of certain of Defendant's affairs, and is, and was, the alter ego of one another. The recognition of the separate existence of IVY GREEN and Defendant/Debtor from one another would not promote justice, in that it would permit Debtor to insulate himself from liability to Plaintiffs for the acts, omissions and/or malfeasance in which Debtor engaged. The corporate existence of IVY GREEN should be disregarded in equity and for the ends of justice because such disregard is necessary to avoid trespass and injustice to Plaintiff herein.

f. Accordingly, IVY GREEN and Defendant/Debtor constitute the alter egos of one another, and the fiction of their separate corporate existence must be disregarded.

## FACTUAL ALLEGATIONS

15. Plaintiffs are the owners of 5316 Ascot Ave., Los Angeles, CA 90011. Plaintiffs also have an additional dwelling unit attached to the property located at 5318 ½ Ascot Ave., Los Angeles, CA 90011 (hereinafter "Subject Property"). Plaintiffs were planning on expanding the Subject Property, making some changes that required construction to be done on the Subject Property.

16. Plaintiffs learned about IVY GREEN online through a social media site.

17. Mrs. Villalobos called IVY GREEN's telephone number, IVY GREEN returned her call and an appointment was made for someone to come meet with Mrs. Villalobos at the Subject Property. The day of the appointment, JAVIER and another employee of IVY GREEN met with Plaintiff.

18. JAVIER asked Mrs. Villalobos what her vision was regarding the construction of her property. Mrs. Villalobos said she already had plans that had been approved by the Los Angeles Department of Business and Safety that showcased what she wanted to be done to her property. Mrs. Villalobos had plans for two projects, a big one and a small one. The big project regarded doing work at around 1,500 square feet and the smaller project regarded doing work around 500 square feet.

19. Mrs. Villalobos showed JAVIER the plans for the smaller project, which is what she wanted originally done. The smaller project involved doing work in the bedroom, kitchen, etc. JAVIER told Mrs. Villalobos that he needed to show these plans to his son, Defendant as he was the engineer and architect. Plaintiff said that was fine.

20. The following day, Mrs. Villalobos was sent an estimate by IVY GREEN detailing the costs of the project. However, as Mrs. Villalobos looked at the cost, she saw that they were too high for what the smaller project entailed. The square feet for the project were much higher and way off for the price. Defendant had somehow mistakenly seen the plans for the bigger project instead of the smaller one and did his estimate based on that.

21. The next time someone from IVY GREEN came to visit Mrs. Villalobos at the Subject Property, both Defendant and JAVIER were present. Mrs. Villalobos showed Defendant both plans. Defendant explained his estimate for the bigger project to Mrs. Villalobos which was around $231,000.00.

22. Mrs. Villalobos spoke with her husband, Martin Villalobos, and they agreed to the price point.

23. Furthermore, considering that IVY GREEN had claimed that they had vast experience and were licensed, Mrs. Villalobos and her husband agreed to hire IVY GREEN and their services.

24. IVY GREEN sent Mrs. Villalobos the contract through email. Mrs. Villalobos was then visited by Defendant and JAVIER to have the contract signed. Mrs. Villalobos signed the contract, ("hereinafter referred to as Contract #1"), on December 19, 2022, as can be seen in ***Exhibit 1***. The total fee would be $231,045.12. Mrs. Villalobos would make the initial payment of $18,000.00 at signing, following that, "owner will pay to Contractor the Contract Price in 10 installments of $18,000.00 every two weeks, contingent on passing inspections" [***Exhibit 1***]. Mrs. Villalobos paid the Defendant the initial $18,000.00 as agreed upon. Mrs. Villalobos then asked Defendant, IVY GREEN and JAVIER when they would begin working on the Subject Property. Defendant and JAVIER told Mrs. Villalobos that they would start work the first business day of the beginning of the year which would be January 2, 2023. Defendant also told Mrs. Villalobos that the projected completion date would be on or before July 1, 2023, no later. JAVIER assured Mrs. Villalobos that the project would be done in the estimated time.

25. On February 27, 2023, Mrs. Villalobos and the Defendant, IVY GREEN and JAVIER signed a second contract, ("hereinafter referred to as Contract #2") where the Defendant, IVY GREEN and JAVIER were to "provide architectural and engineering plans for a supplemental permit" for the Subject Property; this contract can be seen in ***Exhibit 2***. This contract is for the fixed amount of $2,800.00.

26. As promised, Defendant sent employees of IVY GREEN to start work on the Subject Property on January 2, 2023. JAVIER would come to oversee the workers as they were working. Mrs. Villalobos also made her $18,000.00 payments every two weeks because the Defendant always claimed that they were passing inspections. The Defendant personally or through JAVIER or another employee of IVY GREEEN would collect the checks every two weeks and Mrs. Villalobos would pay in reliance on their allegations that the progression of the project was moving forward along with the passing of the required inspections. However, issues later began as the Defendant, IVY GREEN and JAVIER began to breach their side of Contract #1.

27. On or around April of 2023, Plaintiffs began to notice some issues regarding their work. At this point, Plaintiffs had made payments totaling $126,000.00. Any concerns Mrs. Villalobos had regarding the work the Defendant, IVY GREEN and JAVIER were doing were quickly shut down or given some excuse to alleviate Plaintiffs' worries. The Defendant

would tell Mrs. Villalobos not to worry, and that all issues would be resolved. Defendant, IVY GREEN and JAVIER then told Mrs. Villalobos to continue her payments as usual or else that would cause unnecessary delays. So, Mrs. Villalobos continued with her bi-monthly payments.

28. The Defendant, IVY GREEN and JAVIER made several mistakes when working on the project like putting down the cement incorrectly, which ultimately required them to have to break it down and remove it, which in turn, caused more delays. When putting up walls, due to the unevenness of the flooring, the walls were crooked and had to be re-done.

29. Additionally, Mrs. Villalobos was paying for extra materials and covering costs that she had not approved. In ***Exhibit 1***, Contract #1 clearly states that any "costs outside of the scope of Contract Price will be approved by owner" [***Exhibit 1***]. However, these costs were never explained to the Plaintiffs or brought to their attention until after they had been purchased or incurred. These charges can be seen in ***Exhibit 3***.

30. Mrs. Villalobos also noticed on one occasion that material had been purchased by IVY GREEN to be used at the Subject Property including plywood, flooring, etc. This material was essential for the project on the Subject Property. However, a truck from IVY GREEN came to get the materials and left. Mrs. Villalobos happened to have a friend who lived in the same area who was also getting work done by IVY GREEN who told Mrs. Villalobos that the workers had come to drop some materials off after having picked them up from Mrs. Villalobos' house. When Mrs. Villalobos asked Defendant about this, he replied that the materials had been delivered to her Subject Property by mistake which did not make sense to Mrs. Villalobos as she had seen the materials and they were the same ones needed for her Subject Property. As she was the one paying for everything, she did not understand why things that were necessary to working on the Subject Property were being sent somewhere else.

31. As mentioned previously, Contract #1 clearly states that IVY GREEN would be paid their $18,000.00 every two weeks "contingent on passing inspections." Plaintiffs learned that the Defendant and IVY GREEN rarely, if ever, passed any of their inspections. The Defendant always had issues with the city inspector as there were constant problems with the work.
Mrs. Villalobos also noticed that no real progress was being made. While an employee would always be at her Subject Property, no work was being done. Despite her inquiries, Defendant and

JAVIER would always tell Mrs. Villalobos that they were on track and not to worry, that the project would get done. Defendant and his accomplices were knowingly lying to Mrs. Villalobos.

32. After another month without noticeable progress, Mrs. Villalobos had had enough. The project was meant to be done on July 1, 2023, and by late May, there was nothing to indicate that this project would be finished on time or at all. Mrs. Villalobos had kept her side of the agreement and had paid the $18,000.00 every two weeks as required, but the Defendant, IVY GREEN and JAVIER were not passing inspections and were not close to finishing by the due date. Therefore, on May 26, 2023, Mrs. Villalobos made her final payment to the Defendant.

33. When the next invoice was sent to Mrs. Villalobos and she did not pay, the Defendant and his agents immediately contacted Mrs. Villalobos and asked her to come to their office. Mrs. Villalobos said no, and asked them to meet her at the Subject Property. She told the Defendant and his agents over the phone that she could not show them the issues if they met at their office. The Defendant and his agents then went to the Subject Property where Mrs. Villalobos explained all of her issues and concerns. The Defendant responded that he always sent somebody to work, suggesting that that should have been enough. Mrs. Villalobos explained that since no progress was being made, it was like no one had come at all. Mrs. Villalobos then asked why the extra charges when nothing was being done to her Subject Property. Mrs. Villalobos and the Defendant and his agents went back and forth and Defendant was very pushy and did not want to leave the Subject Property without a check and threatened Plaintiffs that he had already won eight lawsuits before and did not disagree with Mrs. Villalobos when she asked whether the Plaintiffs would be the ninth win. Defendant even told Mrs. Villalobos that he would take a check for $5,000.00 but needed a check. Mrs. Villalobos repeatedly said no and told them that she would not pay any more until the project was done. Defendant responded that Mrs. Villalobos wanted him to finance the project. Mrs. Villalobos explained that it was not fair for her to be paying bi-monthly with no fail when the Defendant and IVY GREEN were not keeping their side of the agreement.

34. Following the meeting, the Defendant and his staff left the Subject Property. July 11, 2023 was the last day any employee of IVY GREEN worked at Subject Property. They

tried to repair a door they had installed incorrectly but did not and took all materials with them at the end of the day.

35. On or after July 11, 2023, Plaintiff went to the city to remove the Defendant's IVY GREEN as the contractors of Subject Property. While she was there, Mrs. Villalobos requested the information that reflected what was denied by the city. The document showed several issues of which Mrs. Villalobos was not even aware. The document is attached as ***Exhibit 4***. Many of these inspections were labeled as "corrections issued" which means that the inspected work was not approved or was given conditional approval, partially approved, or flat out not ready to be inspected. Additionally, Mrs. Villalobos received a document reflecting any work that was left pending (unfinished) by the Defendant, IVY GREEN and JAVIER by the Los Angeles Department of Building and Safety which shows that these works were left unfinished since January of 2023, which can be seen in ***Exhibit 5***. That meant that for all of those months of alleged work on the part of the Defendant and of IVY GREEN, they were not doing anything.

36. Despite the fact that Mrs. Villalobos withheld her payments for Contract #1, she was within her right to do so. Contract #1 states that, "Payment of the Contract Price may be withheld because of: (1) defective Work not remedied; (2) continuing failure to perform the Work in accordance with this Agreement or these general conditions; (3) liens or claims filed; or (4) Failure of the Contractor to make proper payments to subcontractors, workers, or suppliers for labor, materials, or equipment. (5) Failure to pass inspection" [***Exhibit 1***]. In this case, the Defendant fell within at least three of the conditions under which Mrs. Villalobos could withhold her bi-monthly payments. The defective work of Defendant, IVY GREEN and JAVIER was not remedied as they made several mistakes and failed to repair or fix them as can be seen in ***Exhibit 5***. Defendant, IVY GREEN and JAVIER continued to fail to perform their work in accordance with Contract #1 as they were working without receiving approval from the city and did not keep Mrs. Villalobos up to date and extra charges were being made as can be seen in ***Exhibits 3 and 4***. Finally, the Defendant, IVY GREEN and JAVIER failed to pass inspection on multiple occasions, as can be seen in ***Exhibit 4***.

37. As to Contract #2, there was also a breach there. Contract #2 was for a fixed fee of $2,800.00 [***Exhibit 2***]. However, Plaintiff paid the Defendant $3,485.5 for the work, as can be seen in ***Exhibit 6***. Even though Contract #2 set a fixed fee for the work, the total amount the

Defendant, IVY GREEN and JAVIER required and the Plaintiffs paid exceeded the fixed fee established in Contract #2

38. After the Plaintiff received all of the aforementioned information, she hired someone to inspect the Subject Property and to make the necessary corrections to send to the city. When this individual contacted the Defendant, IVY GREEN and/or JAVIER to receive the plans for the project, originally Defendant agreed. However, once he found out that he was speaking to the engineer taking over the project, Defendant said no, which further delayed Plaintiff's project from getting done. This was a huge breach as Plaintiff paid for these plans to be written up and now the Defendant and his agents were refusing to return them.

39. Since then, Defendant contacted Plaintiff, demanding she pay for the work the Defendant and his agents had completed but they had not completed anything. Instead, the Plaintiff paid for a job that was never done while the Defendant, IVY GREEN and JAVIER got paid for completing nothing. Pictures of all the work left unfinished by the Defendant, IVY GREEN and JAVIER can be seen in ***Exhibit*** *7*.

**FIRST CLAIM FOR RELIEF**

**(11 U.S.C. § 1328(a)(4))**

40. Plaintiffs adopt and reassert the allegations contained in the foregoing paragraphs as if fully set forth herein.

41. Under 11 U.S.C. § 523(a)(6), a discharge under 11 U.S.C. § 727 does not discharge an individual debtor from any debt for willful and malicious injury by the debtor to another person or entity or to the property of another person or entity. However, 11 U.S.C. § 1328(a)(2) does not except from the discharge claims under 11 U.S.C. § 523(a)(6). Nevertheless 11 U.S.C. § 1328(a)(4) turns around and excepts from the discharge claims "for restitution, or damages, awarded in a civil action against the debtor as a result of willful or malicious injury by the debtor that caused personal injury to an individual or the death of an individual." 11 U.S.C.A. § 1328 (West). The award may be pre- or post-petition. *In re Ang*, 589 B.R. 165, 181 (Bankr. S.D. Cal. 2018). Therefore, Plaintiff hereby adopts 11 U.S.C. § 523(a)(6) to seek relief as other Courts have done. *Id*.

42. Section[1] 523(a)(6) does not require a showing of personal hatred, spite, or ill-will. Willful injury may occur when the debtor believes that injury is "substantially certain to result from his own conduct." *In re Ormsby*, 591 F.3d 1199, 1206 (9th Cir. 2010). Malicious injury under Section 523(a)(6) means that it must also be a wrongful act, done intentionally, which necessarily causes injury, and which is done without just cause or excuse. *In re Thiara*, 285 B.R. 420, 427 (9th Cir. BAP 2002).

43. To "prevail on a § 523(a)(6) conversion claim, a plaintiff "must first establish that a conversion has occurred under California law, and second that the conversion is willful and malicious." *In re Rodriguez*, 568 B.R. 328, 343 (Bankr. S.D. Cal. 2017), aff'd, No. AP 15-90095-CL, 2021 WL 345571 (B.A.P. 9th Cir. Feb. 1, 2021), aff'd, No. 21-60018, 2022 WL 17729254 (9th Cir. Dec. 16, 2022).

44. Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the Plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages.

45. The first element and second elements are met because the Plaintiff is the owner of the money used to pay for the project and was the owner of the items that had been delivered to her Subject Property to only be taken (that is, converted) without her authorization to someone else's property, despite the fact that the materials were necessary for the construction of the Subject Property. Likewise, the first element is met because the Defendant wrongfully demanded and took Plaintiffs' money, but he and IVY GREEN, which includes JAVIER, never finished the Plaintiffs' project and overcharged Plaintiff for products and materials, charges which were never explained, never approved, and some were not even used on the Subject Property.

46. The third element is met because the Plaintiff suffered financial damages. The Plaintiffs paid $18,000.00 every two weeks for work that was not getting done, the Plaintiffs lost the materials they purchased but were taken for the own use of the Debtor or his agents, being charged for materials and changes she had not approved of and having to hire someone else to fix the issues caused by the Defendant, IVY GREEN and JAVIER while also paying them to finish

[1] Unless otherwise noted, references to sections are to sections of the Bankruptcy Code, 11 U.S.C. §§101 et seq.

the project that the Defendant, IVY GREEN and JAVIER were originally hired for but failed to complete, which will cost her around $300,000.00 based on an oral estimate. The acts and omissions of the Defendant, IVY GREEN and JAVIER have caused the project to be delayed and their refusal to share the project plans with Plaintiff's new construction company continued that delay. Therefore, the Plaintiff's damages are substantial and will be established according to proof but are estimated to be no less than approximately $213,500.

47. Furthermore, the third element is met also because the Defendant's acts and omissions caused and continue to cause the Plaintiffs personal injury including, but not limited to, in the form of severe emotional distress, humiliation, hopelessness, fear, loss of self-confidence, nervousness, anxiety, depression, tiredness, oversensitivity, lack of interest and severe headaches.

48. Furthermore, Section 523(a)(6)'s willfulness requirement is met if Plaintiffs establish that either: (1) Defendant had a subjective motive to inflict injury upon [Plaintiffs]; or (2) [he] believed that injury was substantially certain to result from [their] conduct. *Id*. at 344. Here, Defendant assiduously harassed the Plaintiffs into giving him the $18,000 every two weeks even though he and his agents made little progress toward completion of the project at the Subject Property for which they were hired and failed inspections so much that the City's records show that the Defendant, IVY GREEN and JAVIER made little to no substantial progress since the end of January even though the Defendant continued to demand payment from Mrs. Villalobos at the end of May and thereafter. This all shows that the Defendant had the subjective intent to deprive the Plaintiffs of their money. Likewise, the Defendant, IVY GREEN and JAVIER took for Defendant's own use at another property without authorization from the Subject Property materials that had been delivered to the Subject Property that were necessary to complete the work for which the Plaintiffs paid. In addition, Defendant clearly believed that injury was substantially certain to result from the Defendant taking the $18,000 every two weeks for an aggregate of well in excess of $126,000 as evidenced by the fact that Defendant kept insisting that she continue paying the $18,000 every two weeks at the end of May without making progress toward completing the work for which he and his agents were hired and paid. Therefore, the willfulness requirement is met.

49. "A 'malicious' injury involves '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.' *Id*. at 339. The first

three elements are easily met for the reasons stated above, which are hereby incorporated by reference.

50. “The ‘malice’ prong's fourth element is in the nature of an affirmative defense. It is therefore Defendant's burden to show just cause or excuse for converting the [property].” *Id*. at 346. Facts showing a specific intent to cause injury to the Plaintiffs suffices. *Id*. There is plenty of evidence pled hereinabove to show that the Defendant specifically intended to cause injury to the Plaintiffs by depriving them of their money and of the construction materials for which they had paid and by causing the Plaintiffs ongoing personal injury in the form of severe emotional distress, humiliation, hopelessness, fear, loss of self-confidence, nervousness, anxiety, depression, tiredness, oversensitivity, lack of interest and severe headaches. Therefore, the requirement that the injury be malicious is satisfied.

51. In doing the wrongful and intentional acts as alleged herein, Defendant acted with oppression, fraud, and malice and with conscious and willful disregard for the health, safety and general welfare and rights of Plaintiffs. Such action was done with malice, oppression and/or fraud and was and is despicable, shocking and offensive and was a direct and proximate result of Defendant’s actions against Plaintiffs, as alleged above, and, therefore, entitle Plaintiffs to an award not only of compensatory or general damages but also of emotional distress, exemplary and punitive damages against Defendant in an amount to be determined by the Court at trial.

**SECOND CLAIM FOR RELIEF**

**(11 U.S.C. § 523(a)(2)(A))**

52. Plaintiffs adopt and reassert the allegations contained in the foregoing paragraphs as if fully set forth herein.

53. Under 11 U.S.C. § 523(a)(2)(A), a discharge under 11 U.S.C. § 727 does not discharge an individual debtor for money, property, services, or an extension renewal, or refinancing of credit to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor’s or an insider’s financial condition. 11 U.S.C. § 1328(a)(2), which applies while this is a Chapter 13 case, excepts from the discharge claims under 11 U.S.C. § 523(a)(2).

54. “Actual fraud” under section 523(a)(2)(A) requires that (1) the debtor made representations, (2) at the time he made them, he knew they were false, (3) he made them with the

intention and purpose of deceiving the creditor, (4) the creditor relied on such representations, and (5) the creditor sustained the alleged loss and damage as the proximate result of the representations made. When Congress used the term "actual fraud," it "was referring to the general common law of torts." *In re Eashai*, 87 F.3d 1082, 1086 (9th Cir. 1996). This is consistent with the "Ninth Circuit practice of using the common law elements of fraud in exception to discharge cases." *Id.*

55. Here, the first element is met because the Defendant and his agents at all times were aware of their misrepresentation. From the beginning of signing Contract #1, Defendant and his agents swore to Mrs. Villalobos that he and his workers from IVY GREEN would complete the project by July 1, 2023. No matter what issues Mrs. Villalobos could see, whenever she inquired about failed inspections or lack of progress, the Defendant and his agents were quick to assure her that the project would be finished in the time promised. The Defendant was aware at all times that they were concealing information as they had been failing many if not all City inspections and had pending statuses on many issues since January 2023, see ***Exhibits 4 and 5***. The Defendant and his agents were making no discernable effort to fix their mistakes and/or to comply with the city's requirements. If Plaintiff asked about materials being taken from her property, quick excuses were made with the promise that her project would be finished by the set date despite there being no visible progress. The Defendant and his agents would send workers from their company to "work" at the Subject Property but such workers were not doing anything to move the project along.

**56.** The second element is met because the Defendant and his agents were aware at all times of the falsity of the representations. The Defendant, IVY GREEN and his agents were aware that the little work they were doing was not being approved by the city yet they continued to demand the $18,000 every two weeks as if they had done the work and such work had been properly approved. Despite their knowledge, the Defendant and his agents still chose to ignore the changes needed to be made in order to receive approval from the city and chose to ignore the concerns of Mrs. Villalobos and made her false promises, and they ignored the deadline to which they had agreed under Contract #1, while continuing to collect their payments every two weeks of $18,000.00 while telling Plaintiff everything was fine. Both Defendant and JAVIER are alleged professionals and experts in their fields who had knowledge that they were not completing the

work to satisfy City inspections as contractually required and that they were not working at a pace sufficiently fast to complete the work for the Plaintiffs by the July 1, 2023 deadline, especially since they knowingly did not take the time to cure any problems that had caused their work to not be approved by the City.

**57.** The third element is met because the constant assurances to Mrs. Villalobos that the work was being done and on time by the Defendant and his agents was intended to induce and did induce reliance.

**58.** The Plaintiff had plenty of questions throughout the signing of Contract #1 and the project itself. The Defendant and his agents always had an answer and were always quick to assure the Plaintiff not to worry about the delays or about the city as they were going to finish the project on the set date. JAVIER helped induce this reliance as he spoke highly of the Defendant, who is his son and the owner of IVY GREEN. JAVIER swore his son was a great engineer and architect and would handle the project. JAVIER would show up at the Subject Property to, allegedly, supervise, which further induced reliance that the proper work was being done by IVY GREEN and their employees so that Mrs. Villalobos would continue to release the $18,000 every two weeks and would turn a blind eye to their taking the construction materials from the Subject Property elsewhere for their own use..

**59.** The fourth element is met because the Plaintiff justifiably relied that the Defendant was being honest, professional, and operating in a respectable manner. She had no reason not to believe them when they swore to her that the project would be done on time and that they were passing inspections even though she later learned that they were not.

**60.** The fifth element is met because Plaintiff suffered heavy financial damages. The Plaintiffs paid $18,000.00 every two weeks for work that was not getting done, the Plaintiffs lost the materials they purchased but were taken for the own use of the Debtor or his agents, being charged for materials and changes she had not approved of and having to hire someone else to fix the issues caused by the Defendant, IVY GREEN and JAVIER while also paying them to finish the project that the Defendant, IVY GREEN and JAVIER were originally hired for but failed to complete, which will cost her around $300,000.00 based on an oral estimate. The acts and omissions of the Defendant, IVY GREEN and JAVIER have caused the project to be delayed and their refusal to share the project plans with Plaintiff's new construction company continued that

delay. The Debtor's acts and omissions have also cost creditor to lose rental income that she should have been earning after the rental units that were to be built as part of the project were completed. Therefore, the Plaintiff's damages are substantial and will be established according to proof but are estimated to be no less than approximately $213,500.

61. In doing the wrongful and intentional acts as alleged herein, Defendant acted with oppression, fraud, and malice and with conscious and willful disregard for the health, safety and general welfare and rights of Plaintiffs. Such action was done with malice, oppression and/or fraud and was and is despicable, shocking and offensive Therefore, Defendant's actions against Plaintiffs, as alleged above, and, therefore, entitle Plaintiffs to an award not only of compensatory or general damages but also of emotional distress, exemplary and punitive damages against Defendant in an amount to be determined by the Court at trial.

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

a. That the Court determine that the claims owed by the Defendant to the Plaintiffs are nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and/or 1328(a)(4) because they satisfy the elements to establish a claim under 11 U.S.C. § 523(a)(6);

b. That the Court determine the amount to which Plaintiffs are entitled, including, but not limited to, general, compensatory, emotional distress and punitive and exemplary damages;

c. For prejudgment interest on each of the foregoing at the legal rate from the date the obligation became due through the date of judgment in this matter;

d. For attorneys' fees and costs incurred; and,

e. For such other further relief as the Court may deem proper pursuant to 11 U.S.C. § 105, its inherent powers, or otherwise.

Dated: May 2, 2025

**THE ORANTES LAW FIRM, P.C.**

By: /s/ Giovanni Orantes
Giovanni Orantes, Esq.
Attorney for Plaintiffs Rosa Miriam Villalobos and Martin Villalobos Orozco

# EXHIBIT 1

IVY GREEN

Construction

# GENERAL CONTRACTOR AGREEMENT

This General Contractor Agreement is made and effective as of December 17, 2022, by and between *Ivy Green Construction* and *Rosa & Martin Villalobos*, owners. The Contractor and the Owner may be referred to individually as a "Party" or collectively as the "Parties."

## RECITALS

**WHEREAS,** the Owner is the owner of the Property (as defined below); and

**WHEREAS,** the Owner wishes to engage the Contractor as a general contractor to perform certain Work (as defined below) on the Property for the Owner in accordance with the drawings and specifications attached as Exhibit A hereto and on the terms and conditions set forth below; and

[**WHEREAS,** the Contractor is registered with the state as a contractor, and has a registration number of 1014647, expiring on 05/31/2024;] and

**WHEREAS,** the Contractor wishes to perform the Work on the Property in accordance with the drawings and specifications attached as Exhibit A hereto and with the terms of this Agreement; and

**WHEREAS,** each Party is duly authorized and capable of entering into this Agreement.

**NOW THEREFORE,** in consideration of the above recitals and the mutual promises and benefits contained herein, the Parties hereby agree as follows:

1. **SCOPE OF WORK.**

The Contractor shall furnish all of the necessary materials, tools, machinery, supervision, relocation and, site security and perform all of the work described in Exhibit B hereto (the "Work"), all in accordance with the terms of this Agreement. The Work shall be performed on that certain property located **5318-½ Ascot Ave., Los Angeles, CA 90011** (the "Property"), and as more specifically described in Exhibit B. The Contractor agrees that it will perform the services and provide the materials for which it is responsible, will accomplish this Work in the manner and in the time stated herein and in accordance with the drawings and specifications attached as Exhibit A hereto, and will provide the deliverable items as required.

## 2. TIME OF COMPLETION.

The Parties agree that time is of the essence and that the Work to be performed under this Agreement shall therefore start on (or before) January 02, 2023 and shall be [substantially] completed on (or before) July 01, 2023.

## 3. COMPENSATION.

(a) Contract Sum; Payments.

i. Subject to the provisions hereinafter set out, the Owner shall pay to the Contractor for the performance of this Agreement the following items in cash:

1. The actual cost of construction as defined in Section 3(b) below

2. A fee of $231,045.12 (collectively, the "Contract Price")

ii. If, on completion of the Work, the Contractor has received cash payments in excess of (a) the actual cost of construction, plus (b) the cash fee specified in Section 3(a)(i)(2), all such excess shall be refunded to the Owner.

iii. Payment Plan: Owner will pay to Contractor the Contract Price in 10 installments of $18,000 every two weeks, contingent on passing inspections.

iv. The Contract Price covers the cost of items enumerated in Exhibit B including costs detailed in Section 3(b) in the scope of items in Exhibit B.

v. The Actual Cost of Construction will be billed only in what is in excess of the Contract Price.

vi. Actual Cost of Construction includes permitting, licensing, and other costs that are not included under "Contract Price". Contractor will provide a list of anticipated items.

vii. Some costs cannot reasonably be anticipated as projects are reliant on unique and individual factors. In the event of unanticipated costs, the Contractor will provide a list of items and costs to the Owner.

viii. Costs outside of the scope of Contract Price will be approved by owner.

(b) Actual Cost of Construction. The "actual cost of construction," as used in Section 3 (a)(i)(1) above and subject to the restrictions listed in Section 3(c) below, shall include all items of cost and expense incurred by the Contractor in the performance of this Agreement, including costs and expenses of labor, materials for construction, equipment and fixtures, field engineering, sales taxes, workers' compensation insurance, social security, job overhead expenses, and all other expenses directly connected with construction, [and including general overhead expenses], but excluding kickbacks, rebates, and discounts received in connection with the construction of the project provided, however,

that normal cash discounts (2%) obtained on payments made by the Contractor shall accrue to the Contractor; and excluding any return on or cost of the Contractor's working capital, such return on or cost of working capital being a part of or to be paid from the Contractor's fee or profit.

(c) Restrictions on Payment. This amount shall be paid only to the extent that costs are incurred by the Contractor in its performance of the Work in accordance with the provisions of this Agreement and the following:

i. Staff Charges. The Contractor shall be compensated for the services performed by its employees under the terms of this Agreement at the employee's actual wage rate; provided, however, that charges to the cost of the Work that are reimbursable shall be limited to actual costs of the Contractor's salaried construction personnel stationed at the Property. The Parties agree that the following positions represent the maximum authorized field office staff salaried positions that will be considered reimbursable under the terms of this Agreement, unless substantially changed for reasons approved by the Owner by a formal change order to the Agreement:

Reimbursable costs for the above-listed individuals shall begin no earlier than the time such individuals report for work at the Property after the official start of construction. Charges for such individuals will be considered non-reimbursable (1) at the time they conclude their service at the Property; or (2) 60 days after substantial completion which ever is earlier.

i. Overtime Wages. Overtime wages paid to salaried personnel (if approved in advance in writing by the Owner) shall be reimbursed at the actual overtime rate paid to the individual. No time charges or other reimbursement for overtime hours worked under the Agreement will be allowed if the individual is not paid for the overtime worked.

ii. Overtime Premium Charges. Any overtime premium or shift differential expense to be incurred by the Contractor for hourly workers shall require Owner's advance written approval before the incremental cost of the overtime premium or shift differential will be considered a reimbursable cost. If the Contractor is required to work overtime as a result of an inexcusable delay or other coordination problems caused by the Contractor or anyone for whom it is responsible, the overtime premium and/or shift differential expense portion of the payroll expense and related labor burden costs shall be considered non-reimbursable costs.

iii. Taxes. (1) Proper consideration shall be given to annual limitations on wages subject to such payroll taxes and the worker's applicable percentage of annual wages attributable to this project when computing payroll taxes chargeable as a cost of the Work.

(2) Any payroll burden related costs to be reimbursed shall be subject to advance written approval by the Owner to be considered reimbursable. Costs typically falling into this category include, but are not limited to, pension, employee stock option plans, bonuses, medical and dental benefits, life and accident insurance, etc. The Contractor shall be required to submit a detailed breakdown of all such payroll costs along with a representation as to how the proposed actual billable cost will be computed. Such information must be reviewed and approved in writing by the Owner before the Contractor may include such items as billable costs. During the job and prior to the close-out of the Agreement, appropriate adjustments will be made by the Contractor to account for increases or decreases in actual costs.

iv. Direct Charges. The Contractor shall be reimbursed for reasonable and necessary actual direct costs incurred (e.g., equipment, supplies, travel, and other costs directly associated with the performance of the Agreement) to the extent required in the performance of the Work in accordance with the provisions of this Agreement and Exhibit B hereto. Costs should generally not exceed the daily per diem rates published in the Federal Travel Regulations. Reimbursement for the use of personal vehicles shall be limited to the Internal Revenue Service business standard mileage rate.

4. **PROGRESS PAYMENTS.**

(a) Payments; Invoices. The Contractor may submit invoices for progress payment no more frequently than once a month and no less frequently than once each calendar quarter for Work performed during such period; provided, however, that such invoices shall be submitted at least 2 days before the date payment is desired. Invoices shall set forth total project costs incurred and shall be in a format consistent with the cost categories set forth in Exhibit B. Invoices shall provide reasonable documentation for the above to provide evidence of costs incurred, including:

(1) Staff charges: for each employee, the name, title, number of hours worked, hourly rate, and labor extension;

(2) Direct charges: all direct costs shall be itemized on the invoice and supported by documentation, such as vendor invoices, travel vouchers, or other documentation; and

The Owner shall pay to the Contractor, within the prescribed time after receipt of an invoice for a progress payment, 90% of the amount so requested, unless the Owner determines that any such payment or any part thereof is otherwise not properly payable pursuant to the terms of the Agreement.

(b) Affidavit of Contractor. Prior to each payment by the Owner, the Contractor shall affirm in writing that there are no liens or claims filed against the Contractor or the Owner related to materials, labor, or services supplied on this or any other project in which the Contractor was or is currently involved. No payment shall be

made to the Contractor if a lien has been filed with respect to the Work that is the subject of this Agreement.

(c) Withholding of Payments. Payment of the Contract Price may be withheld because of:

(1) defective Work not remedied;

(2) continuing failure to perform the Work in accordance with this Agreement or these general conditions;

(3) liens or claims filed; or

(4) Failure of the Contractor to make proper payments to subcontractors, workers, or suppliers for labor, materials, or equipment.

(5) Failure to pass inspection

(d) Final Payment. Upon final acceptance by the Owner of all deliverables contained in Exhibit B, Scope of Work, the Contractor shall submit an invoice for final payment with respect to the Work, together with such supporting information and documentation as, and in such form as, the Owner may require [, which documentation may include a completed "Contractor's Certificate of Actual Cost," accompanied and supported by an independent public accountant's certificate as to actual cost]. An invoice for final payment shall include the material required pursuant to Section 4(a) above. All invoices for final payment hereunder must, under any and all circumstances, be received by the Owner within (8) days after the request for final payment by the Contractor provided that the Work be then satisfactorily performed, and further subject to receipt by the Owner of the same affirmation relative to existing liens or claims against the Contractor as set forth in Section 4(b) above. The Owner shall pay to the Contractor within the prescribed time after receipt of such invoice for final payment, the maximum amount payable pursuant to Section 3 above, less all progress payments previously made to the Contractor with respect thereto and subject to the maximum commitment of $10,000 set forth in Section 4(h) below. On such final payment, the Contractor shall provide to the Owner a final release of lien stating that the Contractor has no further claims or liens against the Owner for materials or labor supplied under this Agreement.

(e) Waiver of Owner's Claims. The making of final payment shall constitute a waiver of all claims by the Owner except those arising from:

(1) unsettled liens;

(2) faulty or defective work appearing after substantial completion;

(3) failure of the Work to comply with the requirements of Exhibit A.

(f) Waiver of Contractor's Claims. The acceptance of the final payment shall constitute a waiver of all claims by the Contractor except those previously made in writing and identified by the Contractor as unsettled at the time of the final payment.

(g) Maintenance of Financial Records. The Contractor shall keep, maintain, and preserve at its principal office throughout the term of the Agreement and for a period of 4 years after acceptance of the Work, full and detailed books, accounts, and records pertaining to the performance of the Agreement and the actual cost of construction, including without limitation, all bills, invoices, payrolls, subcontracting efforts, and other data evidencing, or in any material way related to, the direct and indirect costs and expenses incurred by the Contractor in the course of such performance.

(h) Maximum Amount Payable. The Owner shall not be liable for any costs or expenses in excess of such amount incurred by the Contractor in the performance and completion of the Work.

(i) Audit Rights. The Owner shall have the right from time to time and at all reasonable times during the term of the Agreement and such period thereafter to inspect and audit any and all books, accounts and records at the office or offices of the Contractor where they are then being kept, maintained, and preserved pursuant to Section 4(g) above. Any payment made under the Agreement shall be subject to retroactive reduction for amounts included therein that are found by the Owner on the basis of any audit of the Contractor by the Owner or its agents not to constitute an allowable charge or cost hereunder.

(j) Requirement on Subcontracts. The Contractor shall include in all subcontracts, equipment leases, and purchase orders a provision requiring the subcontractor, equipment lessor, or supplier to certify its costs incurred in connection with the Work, in the event the Owner determines there is an identity of interest between the Owner or the Contractor and any such subcontractor, equipment lessor, or supplier.

(k) Payment Failure. If the Owner shall fail to make any payment due, except for conditions identified in Section 4(c) above, the Contractor may cease Work; provided, however, the Contractor shall resume performance of the Work and other obligations after payment or other resolution of the dispute.

## 5. LICENSES AND PERMITS.

The Contractor shall comply with all state and local licensing and registration requirements for the type of work performed. The Contractor shall obtain and, at its expense, pay for any and all licenses or permits required by law to accomplish any Work required in connection with this Agreement, agrees to hold the Owner harmless for any violations, and shall accordingly indemnify the Owner.

## 6. REPRESENTATIONS AND WARRANTIES.

(a) The Parties each hereby represent and warrant as follows:

(1) Each Party has full power, authority, and right to perform its obligations under the Agreement.

(2) This Agreement is a legal, valid, and binding obligation of each Party, enforceable against it in accordance with its terms (except as may be limited by bankruptcy, insolvency, moratorium, or similar laws affecting creditors' rights generally and equitable remedies).

(3) Entering into this Agreement will not violate the charter or bylaws of either Party or any material contract to which that Party is also a party.

(4) The drawings and specifications attached to this Agreement as Exhibit A are the final drawings and specifications of the Work, and form an integral part of this Agreement. Neither Party may add or otherwise vary additions said drawings and specifications without the prior written consent of the other Party.

(5) The Contractor may, in its discretion, engage licensed subcontractors to perform the Work; provided, however, that the Contractor must fully pay any such subcontractor and, in all instances, will remain responsible for the completion of this Agreement and the Work.

(b) The Contractor hereby represents and warrants as follows:

(1) The Work shall be performed in a workman-like manner, according to standard industry practices and in compliance with all building codes and other applicable laws; provided, however, that if other standards or requirements are set forth in any attached plans and specifications, those other standards or requirements shall control.

(2) The Work shall be performed by individuals duly licensed and authorized by law to perform said work, to the extent required by law.

(3) The Contractor shall provide the Owner with appropriate releases or waivers of liens at the time of payment for any Work performed.

(4) The Contractor shall remove any debris or other garbage from the Property, and leave the Property in broom clean condition after the Work has been completed.

(5) The Contractor is responsible for paying all ordinary and necessary expenses of its staff.

(6) The Contractor warrants that it is adequately insured for injury to its employees and others incurring loss or injury as a result of the acts of the Contractor or its employees or subcontractors and shall provide the Owner with proper certificates of insurance. The Contractor acknowledges that it is solely responsible for providing insurance coverage for itself and its staff.

(7) The Contractor shall obtain all necessary approvals from local authorities or other statutory bodies concerned for the Work and shall hold the Owner harmless for any violations and accordingly indemnify the Owner.

(8) The Contractor shall obtain insurance to protect itself against claims for property damage, bodily injury, or death due to its performance under this Agreement.

(c) The Owner hereby represents and warrants as follows:

(1) The Owner is the registered owner of the Property.

(2) The Owner will make timely payments of amounts earned by the Contractor under this Agreement.

(3) The Owner shall notify the Contractor of any changes to its procedures affecting the Contractor's obligations under this Agreement at least 8 days prior to implementing such changes.

(4) The Owner shall provide such other assistance to the Contractor as it deems reasonable and appropriate.

7. **WAIVER OF LIABILITY.**

If the Contractor is injured while performing the work specified under this Agreement, the Owner shall be exempt from liability for those injuries to the fullest extent allowed by law.

8. **SURETY BOND.**

Before starting the Work under this Agreement, the Contractor shall be required to obtain a surety bond in the amount of $15,000, which will cover its obligations under this Agreement.

9. **INDEMNIFICATION.**

The Contractor shall indemnify and hold harmless the Owner from and against any and all damages, liabilities, costs, expenses, claims, and/or judgments, including, without limitation, reasonable attorneys' fees and disbursements that any of them may suffer from or incur and that arise or result primarily from (i) any gross negligence or willful misconduct of the Contractor arising from or connected with Contractor's carrying out of

its duties under this Agreement, or (ii) the Contractor's breach of any of its obligations, agreements, or duties under this Agreement.

**10. WARRANTY.**

(a) Correction of Defective Work. The Contractor shall promptly correct any Work rejected as defective or as failing to conform to Exhibit A, whether observed before or after substantial completion and whether or not fabricated, installed, or completed, and shall correct any Work found to be defective or nonconforming within a period of 10 year[s] from the date of substantial completion of the Agreement or within such longer period of time as may be prescribed by law. The Contractor shall correct these mistakes within a reasonable time after receiving the Owner's written instructions and at Contractor's own cost (unless otherwise agreed by the Parties); provided, however, that the Contractor shall not be required to correct at its own cost any damage that occurred after completion of the Work, unless the Parties agree that such damage is because of an injury that took place before the Work was completed.

(b) Normal Wear and Tear Only. The Contractor shall only be responsible for damages sustained by the Owner under conditions of normal wear and tear, and shall under no circumstances be responsible for damages or losses caused by wear and tear, misuse, neglect, negligence, abuse, or accident, or because of or arising from any risk insured against in terms of the homeowner's insurance policies normally issued by a reputable insurance company for residential properties. The Contractor shall under no circumstances be liable for any consequential loss or damage.

**11. TERMINATION.**

This Agreement may be terminated:

(a) By either Party on provision of 8 days' written notice to the other Party, with or without cause.

(b) By either Party for a material breach of any provision of this Agreement by the other Party, if the other Party's material breach is not cured within 8 days of receipt of written notice thereof.

(c) By the Owner, if the Contractor defaults or persistently fails or neglects to carry out the Work or fails to perform any provision of the Agreement after 8 days' written notice to the Contractor. Without prejudice to any other remedy the Owner may have, the Owner may make good such deficiencies and may deduct the cost thereof from the payment due the Contractor or, at the Owner's option, may terminate the Agreement and take possession of the site and of all materials and equipment.

(d) By the Owner at any time and without prior notice, if the Contractor is convicted of any crime or offense, fails or refuses to comply with the written policies or

reasonable directives of the Owner, or is guilty of serious misconduct in connection with performance under this Agreement.

In the event of termination not the fault of the Contractor, the Company shall promptly pay the Contractor according to the terms of Exhibit A for services rendered before the effective date of the termination. The Contractor acknowledges and agrees that no other compensation, of any nature or type, shall be payable hereunder following the termination of this Agreement.

12. **ACCESS TO WORK.**

The Owner, the Owner's representatives, and public authorities shall at all times have access to the Work.

13. **NOTICE OF RIGHT TO CANCEL.**

**THE OWNER HAS AN UNCONDITIONAL RIGHT TO CANCEL THE CONTRACT UNTIL MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE AGREEMENT IS SIGNED. CANCELLATION MUST BE DONE IN WRITING.**

14. **ADDITIONAL AGREEMENT TERMS.**

The Owner and the Contractor hereby agree to the following additional terms:

______________________________________________________________________________
______________________________________________________________________________
_____________________________________________________________________________.

15. **ASSIGNMENT.**

The rights and the duties of the Contractor under this Agreement are personal, and may not be assigned or delegated without the prior written consent of the Owner. The Owner may assign its rights and duties under this Agreement with the prior written consent of the Contractor.

16. **SUCCESSORS AND ASSIGNS.**

All references in this Agreement to the Parties shall be deemed to include, as applicable, a reference to their respective successors and assigns. The provisions of this Agreement shall be binding on and shall inure to the benefit of the successors and assigns of the Parties.

17. **NO IMPLIED WAIVER.**

The failure of either Party to insist on strict performance of any covenant or obligation under this Agreement, regardless of the length of time for which such failure continues, shall not be deemed a waiver of such Party's right to demand strict compliance in the future. No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation under this Agreement shall constitute a consent or waiver

to or of any other breach or default in the performance of the same or any other obligation.

18. **NATURE OF RELATIONSHIP.**

The Contractor is not an employee of the Owner; the Contractor is working in its capacity as an independent contractor. The Contractor agrees to hold the Owner harmless and indemnify the Owner for any claims, including (but not limited to) liability insurance, workers' compensation, and tax withholding for the Contractor's employees.

19. **NOTICE.**

Any notice or other communication provided for herein or given hereunder to a Party hereto shall be in writing and shall be given in person, by overnight courier, or by mail (registered or certified mail, postage prepaid, return receipt requested) to the respective Party as follows:

If to the Owner:

________________________________________
________________________________________
________________________________________

If to the Contractor:

________________________________________
________________________________________
________________________________________

20. **CHANGE ORDERS.**

All changes and/or deviations in the Work ordered by the Owner must be in writing as a change order, a form of which is attached as Exhibit C hereto and made part hereof. The Contract Price will be increased or decreased accordingly by the Parties' agreement. Any claims that the Contract Price should be increased based on changes and/or deviations in the Work must be presented to the Owner by the Contractor in writing. The Owner's written approval of such Contract Price increase must be obtained by the Contractor before any change and/or deviation in the Work is started. The valuation of the Contract Price change will be assessed on the basis of the valuation of similar work included in this Agreement.

21. **OWNERSHIP OF DRAWINGS AND OTHER ITEMS.**

All drawings, reports, designs, sketches, working drawings, shop drawings, documents, certificates, plans, specifications, estimates, memoranda, analyses, calculations, models and other tangible evidence of the Contractor's work product prepared in connection with the Work shall become and remain the sole property of the Owner. The Contractor may retain copies of its work product for its records; provided, however, that any use thereof (other than with respect to the Work) without the written consent of the Owner is

prohibited. Any devices (other than equipment or devices which constitute part of the Work) or methods now being used in the marketplace, and incorporated into the project, are not considered to be property of the Owner. Innovative construction methods or mechanical devices developed by the Contractor or its subcontractors and used in connection with the Work are not considered the property of the Owner unless such methods or devices were developed by the Owner or the Owner's separate contractors.

22. **TYPES OF MATERIALS.**

All materials used by the Contractor in performing the work shall be new, in compliance with all applicable laws and codes, and covered by a manufacturer's warranty (if appropriate) [except as follows]:

______________________________________________________________________

______________________________________________________________________.

23. **OWNERSHIP OF MATERIALS.**

Any materials that are unfixed and required to perform the Work and that are delivered to the Property under this Agreement shall remain the property of the Contractor until they have been paid for by the Owner.

24. **MATERIALS IN SHORT SUPPLY.**

If any of the materials set out in Exhibit A hereto are in short supply or are unavailable for an unreasonable amount of time, the Owner shall select alternative material of similar quality from alternative (and readily available) materials proposed by the Contractor. The responsibility for paying any difference in price between the original materials and the alternative materials shall lie with the Owner.

25. **MODIFICATION.**

No amendment, addendum, change, or modification of this Agreement shall be valid unless in writing and signed by both Parties.

26. **GOVERNING LAW.**

This Agreement shall be governed by the laws of the state of California. In the event that litigation results from or arises out of this Agreement or the performance thereof, the Parties agree to reimburse the prevailing party's reasonable attorneys' fees, court costs, and all other expenses, whether or not taxable by the court as costs, in addition to any other relief to which the prevailing party may be entitled.

27. **COUNTERPARTS/ELECTRONIC SIGNATURES.**

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. For purposes of this Agreement, use of a facsimile, e-mail, or other electronic medium shall have the same force and effect as an original signature.

28. **SEVERABILITY.**

Whenever possible, each provision of this Agreement, will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal, or unenforceable provisions had never been contained herein.

29. **ENTIRE AGREEMENT.**

This Agreement, constitutes the final, complete, and exclusive statement of the agreement of the Parties with respect to the subject matter hereof, and supersedes any and all other prior and contemporaneous agreements and understandings, both written and oral, between the Parties.

30. **HEADINGS.**

Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent.

31. **ARBITRATION.**

(a) Any controversy or Claim arising out of or relating to this contract or contract warranty or the breach thereof which cannot be resolved by mediations shall be settled by arbitration administered by the American Arbitration Association and paid by both parties 50/50, under its Construction Industry Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

(b) Anything in this contract notwithstanding, any Claim arising out of or relating to the Contract Documents or warranty or the breach thereof may, at the option of the Claimant, be filed in any Small Claims Court having jurisdiction, in lieu of an arbitration proceeding.

32. **CITY INSPECTORS.**

(a). Any backlog of City inspector schedules is not to be considered within the initial estimated completion timeframe.

(b). Any special requests made by City inspectors in excess of the provided Scope of Work is to be considered a change order.

(c). Change orders performed in request of City inspectors is not to be considered within the initial estimated completion timeframe.

(d). In the event of a stop-work order issued by the City, Ivy Green shall bear no responsibility on meeting the completion timeframe.

## 33. IN THE EVENT OF FORCE MAJEURE

"Event of Force Majeure" means an event beyond the control of the Authority and the Operator, which prevents a Party from complying with any of its obligations under this Contract, including but not limited act of God, nature, war, terrorist attack neither the Authority nor the Operator shall be considered in breach of this Contract to the extent that performance of their respective obligations (excluding payment obligations) is prevented by an Event of Force Majeure that arises after the Effective Date.

## 34. PENALTIES.

If, for any reason, the work needs to stop for lack of payment intended towards the purchase of materials and wages, there will be a compensation made to the contractor of $200 dollars per day, as paid by the owner.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

**OWNER** ROSA & MARTIN VILLALOBOS

Signature: Rosa Villalobos.
Date: 12/19/22

**CONTRACTOR** BYRON VALENCIA, IVY GREEN CONSTRUCTION

Signature: [signature]
Date: December 19, 2022

# EXHIBIT A
# DRAWINGS AND SPECIFICATIONS

(Attached to Agreement)

# EXHIBIT B
# SCOPE OF WORK

(Attached to Agreement)

# EXHIBIT C
# FORM OF CHANGE ORDER

| Change Order No: | |
|---|---|
| Date: | |
| Contractor's Name and Address: | Owner's Name and Address: |

**THE CONTRACTOR AGREEMENT IS HEREBY CHANGED AS FOLLOWS**

Additional Contract Days: (if none, state "NONE"):

**ALL OTHER TERMS AND CONDITIONS OF THE CONTRACTOR AGREEMENT THAT ARE NTO CHANGED BY THIS CHANGE ORDER REMAIN IN FULL FORCE AND EFFECT.**

**PREVIOUS CONTRACT PRICE: $**

**REVISED CONTRACT PRICE: $**

**ACCEPTANCE**

The above prices, specifications, and conditions are satisfactory, and are hereby accepted. The Contractor is authorized to do the work as specified, and the Owner shall make payments as outlined above.

Owner Signature: ______________________________ Date: ________________

Contractor Signature: ______________________________ Date: ________________

EXHIBIT "B"

IVY GREEN

Construction

## 5318-1/2 Ascot Ave

Cost Analysis for: 320 sq.ft (Addition to Duplex)

| | Price/sq.ft | Total |
|---|---|---|
| 1. PROJECT MANAGEMENT | | |
| 1. Bond and Insurance | $2.88 | $921.60 |
| 2. Contractor's Fee | $14.92 | $4,774.40 |
| 3. Site Utilities | $2.84 | $908.80 |
| 4. Dumpster | $0.00 | $0.00 |
| 5. Hauling | $0.00 | $0.00 |
| | | **$6,604.80** |
| 2. GRADING | | |
| 1. Earthwork | $0.00 | $0.00 |
| 2. Deputy Inspections | $0.00 | $0.00 |
| | | **$0.00** |
| 3. FOUNDATION | | |
| 1. Concrete & Concrete Pumping | $0.00 | $0.00 |
| 2. Rebar | $0.00 | $0.00 |
| 3. Waterproofing | $0.00 | $0.00 |
| | | **$0.00** |
| 4. CARPRENTY | | |
| 1. Rough Framing | $26.44 | $8,460.80 |
| 2. Hardware | $5.82 | $1,862.40 |
| 3. Moldings | $3.74 | $1,196.80 |
| 4. Finish Carpentry | $6.38 | $2,042.88 |
| | | **$13,562.88** |
| 5. ELECTRICAL | | |
| 1. Electric Rough | $12.24 | $3,916.80 |
| 2. Electric Finish | $3.92 | $1,254.40 |
| | | **$5,171.20** |
| 6. INSULATION | | |
| 1. Buiding Insulation | $6.44 | **$2,060.80** |
| 7. DECK | | |
| 1. Deck Coating | $16.88 | $5,401.60 |
| 2. Guardrail (Wood) | $10.28 | $3,289.60 |
| | | **$8,691.20** |

Jorgado

EXHIBIT B - 2/4

| | | |
|---|---|---|
| **8. WINDOWS / DOORS** | | |
| 1. Windows & Sliding Glass Doors | $0.00 | $0.00 |
| 2. Doors | $0.00 | $0.00 |
| 3. Hardware | $2.10 | $672.00 |
| | | **$672.00** |
| **9. FINISHES** | | |
| 1. Stucco/Siding | $7.48 | $2,393.60 |
| 2. Flooring (Vinyl) | $8.92 | $2,854.40 * |
| 3. Painting | $6.64 | $2,124.80 * |
| 4. Drywall | $10.08 | $3,225.60 |
| | | **$10,598.40** |
| **10. FIXTURES** | | |
| 1. Counter Tops / Bath & Kitchen Sinks | $0.00 | $0.00 |
| 2. Kitchen Cabinetry | $0.00 | $0.00 |
| 3. Toilet, Sink, and Vanity Accessories | $0.00 | $0.00 |
| 4. Appliances | $0.00 | $0.00 |
| 5. Appliances Installation | $2.44 | $780.80 |
| | | **$780.80** * |
| **11. SPECIALTIES** | | |
| 1. Bathroom Mirrors & Shower Doors | $0.00 | $0.00 |
| | | **$0.00** |
| **12. PLUMBING** | | |
| 1. Rough Plumbing | $12.36 | $3,955.20 |
| 2. Fixtures & Finish Plumbing | $5.44 | $1,740.80 |
| 3. HVAC Systems | $12.84 | $4,108.80 * |
| | | **$9,804.80** |
| **13. SPECIALTIES** | | |
| 1. Upgrade Electrical Panel | $0.00 | $0.00 |
| 2. Low Impact Development | $0.00 | $0.00 |
| | | **$0.00** |
| | Price/sq.ft | Total |
| **GRAND TOTAL:** | **$181.08** | **$57,946.88** |

IVY GREEN

Construction

## 5316 Ascot Ave

Cost Analysis for: 1184 sq.ft (New Detached ADU)

| | Price/sq.ft | Total | |
|---|---|---|---|
| 1. PROJECT MANAGEMENT | | | |
| 1. Bond and Insurance | $2.80 | $3,315.20 | pagado! |
| 2. Contractor's Fee | $8.88 | $10,513.92 | |
| 3. Site Utilities | $2.68 | $3,173.12 | |
| 4. Dumpster | $3.34 | $3,954.56 | |
| 5. Hauling | $3.92 | $4,641.28 | |
| | | **$25,598.08** | |
| 2. GRADING | | | |
| 1. Earthwork | $4.94 | $5,848.96 | |
| 2. Deputy Inspections | $1.88 | $2,225.92 | |
| | | **$8,074.88** | |
| 3. FOUNDATION | | | |
| 1. Concrete & Concrete Pumping | $5.98 | $7,080.32 | |
| 2. Rebar | $4.84 | $5,730.56 | |
| 3. Waterproofing | $4.64 | $5,493.76 | |
| | | **$18,304.64** | |
| 4. CARPRENTY | | | |
| 1. Rough Framing | $24.04 | $28,463.36 | |
| 2. Hardware | $5.18 | $6,133.12 | |
| 3. Moldings | $2.98 | $3,528.32 | NO |
| 4. Finish Carpentry | $4.54 | $5,375.36 | |
| | | **$43,500.16** | |
| 5. ELECTRICAL | | | |
| 1. Electric Rough | $9.20 | $10,892.80 | no terminado. |
| 2. Electric Finish | $2.80 | $3,315.20 | |
| | | **$14,208.00** | |
| 6. INSULATION | | | |
| 1. Buiding Insulation | $6.08 | **$7,198.72** | partial |
| 7. ROOFING | | | |
| 1. Roofing | $6.24 | $7,388.16 | |
| 2. Roof Specialties & Accessories | $2.66 | $3,149.44 | |
| | | **$10,537.60** | |

EXHIBIT B - 4/4

| | | |
|---|---|---|
| **8. WINDOWS / DOORS** | | |
| 1. Windows & Sliding Glass Doors | $0.00 | $0.00 |
| 2. Doors | $0.00 | $0.00 |
| 3. Hardware | $2.10 | $2,486.40 |
| | | **$2,486.40** |
| **9. FINISHES** | | |
| 1. Stucco/Siding | $6.92 | $8,193.28 |
| 2. Flooring (Vinyl) | $8.66 | $10,253.44 |
| 3. Painting | $5.88 | $6,961.92 |
| 4. Drywall | $8.98 | $10,632.32 |
| | | **$36,040.96** |
| **10. FIXTURES** | | |
| 1. Counter Tops / Bath & Kitchen Sinks | $0.00 | $0.00 |
| 2. Kitchen Cabinetry | $0.00 | $0.00 |
| 3. Toilet, Sink, and Vanity Accessories | $0.00 | $0.00 |
| 4. Appliances | $0.00 | $0.00 |
| 5. Appliances Installation | $2.44 | $2,888.96 |
| | | **$2,888.96** |
| **11. SPECIALTIES** | | |
| 1. Bathroom Mirrors & Shower Doors | $0.00 | $0.00 |
| | | **$0.00** |
| **12. PLUMBING** | | |
| 1. Rough Plumbing | $9.88 | $11,697.92 |
| 2. Fixtures & Finish Plumbing | $5.06 | $5,991.04 |
| 3. HVAC Systems | $10.34 | $12,242.56 |
| | | **$29,931.52** |
| **13. SPECIALTIES** | | |
| 1. Upgrade Electrical Panel | $0.00 | $0.00 |
| | | **$0.00** |
| | Price/sq.ft | Total |
| **GRAND TOTAL:** | **$167.88** | **$198,769.92** |

NO

NO

GENERAL NOTES

# ADDITION & ADU

## ADDITION - 5316 S. ASCOT AVE
## ADU - 5318 1/2 S. ASCOT AVE
## LOS ANGELES, CA 90011

### VICINITY MAP



SITE LOCATION

### PROJECT DIRECTORY

### PROJECT SCOPE

### PROJECT INFORMATION

| | |
|---|---|
| EXISTING HOUSE: | 2,891 SF |
| EXISTING GARAGE: | 330 SF |
| NEW ADU: | 1,164 SF |
| NEW ADDITION: | 320 SF |
| TOTAL: | 4,531 SF |

FAR ANALYSIS:

| | |
|---|---|
| CONSTRUCTION TYPE: | VB (NON-SPRINKLERED) |
| OCCUPANCY: | SINGLE FAMILY (R-1) |
| STORIES: | 2 |
| ALLOWABLE BUILDING HEIGHT: | 33'-0" |
| FIRE SPRINKLER: | NO |
| PARKING: | (E) 2 CAR GARAGE |
| SETBACKS: | FRONT; SIDE (EAST); REAR; SIDE (WEST) |
| APPLICABLE CODES: | 2020 CALIFORNIA RESIDENTIAL CODE<br>2020 CALIFORNIA PLUMBING CODE<br>2020 CALIFORNIA MECHANICAL CODE<br>2020 CALIFORNIA ELECTRICAL CODE<br>2020 GREEN BUILDING STANDARDS CODE<br>2020 CALIFORNIA ENERGY CODE<br>2020 CALIFORNIA FIRE CODE |
| GOVERNING AGENCY: | CITY OF LOS ANGELES |

### PROJECT INDEX

ARCHITECTURAL

STRUCTURAL

### SYMBOLS

FLOOR PLAN

### ABBREVIATIONS

STORMWATER MITIGATION
LOW IMPACT DEVELOPMENT (LID)
APPROVED WITH CONDITIONS

Digitally Signed by: S. Youssef Date: 03/03/2022

LR/A
LR/A ARCHITECTURE

PROJECT
ADDITION & ADU

CLIENT
MARTIN & ROS

DRAWN
STAFF

TITLE
COV


KEYNOTES
LEGEND
SITE PLAN
1
PLAN NOTES
Cushman
150 Gallon
TOP VIEW
SIDE VIEW
PART NUMBERS
1'5"
4'1"
3'8"
4'2"
SMALL RESIDENTIAL
2
LR/ARCH
Architecture
Planning
Interior Design
Construction Management
PROJECT
ADDITION & ADU
ADDITION - 5316 S ASCOT AVE
ADU - 5316-1/2 S ASCOT AVE
LOS ANGELES CA 90011
CLIENT
MARTIN & ROSA VILLALOBOS
5316 S ASCOT AVE
LOS ANGELES CA 90011
REVISIONS
DRAWN
STAFF
CHECKED
CAD FILE
JOB NO.
21.599.00
DATE
1/14/2022
SCALE
AS SHOWN
TITLE
SITE PLAN
SHEET




PROPOSED ADU TO MATCH THE MAIN DWELLING IN COLOR AND MATERIAL TYPE

KEYNOTES

LEGEND

FIRST FLOOR PLAN 1
SCALE: 1/4" = 1'-0"

PLUMBING FIXTURES AND FIXTURE FITTINGS ON THE PLANS SHALL COMPLY WITH THE FOLLOWING FLOW RATES:

A. WATER CLOSETS - 1.28 GPF
B. SINGLE SHOWERHEAD - 1.8 GPM @ 80PSI
C. MULTIPLE SHOWERHEADS - 1.8 GPM AT 80PSI FOR ALL COMBINED SHOWERHEADS
D. LAVATORY FAUCETS - 1.2 GPM AT 60PSI
E. METERING FAUCETS: 25 GALLONS PER CYCLE
F. KITCHEN FAUCETS - 1.8 GPM @ 60 PSI

ALL SHOWER AND TUB SHOWERS SHALL HAVE A PRESSURE BALANCE, THERMOSTATIC MIXING VALVE, OR A COMBINATION PRESSURE BALANCE/ THERMOSTATIC MIXING TYPE VALVE.

ALL NEW REPLACEMENT AND EXISTING WATER HEATERS SHALL BE STRAPPED TO THE WALL IN TWO PLACES. ONE OF THE UPPER ⅓ OF THE TANK AND ONE ON THE LOWER ⅓ OF THE TANK. THE LOWER POINT SHALL BE A MINIMUM OF 4 INCHES ABOVE THE CONTROLS.

PROVIDE 6-0" HIGH NON-ABSORBENT WALL ADJACENT TO SHOWER AND APPROVED SHATTER-RESISTANT MATERIALS FOR SHOWER ENCLOSURE.

SHOWER DOORS SHALL SWING OUT. NET AREA OF SHOWER RECEPTOR SHALL BE NO LESS THAN 1,024 SQ IN. OF FLOOR AREA AND ENCOMPASS 30 IN DIAMETER CIRCLE.

INSULATION
- CEILING JOIST R-30
- ROOF RAFTER R-13
- WALLS R-13+5
- FLOOR R-19

SMOKE ALARM REQUIREMENTS:
A) AN APPROVED SMOKE ALARM SHALL BE INSTALLED FOR NEW CONSTRUCTION AND ALTERATION, REPAIR OR ADDITIONS REQUIRING PERMIT EXCEEDING $1000.
B) BATTERY OPERATED SMOKE ALARMS PERMITTED IN EXISTING BUILDINGS WHERE NO CONSTRUCTION IS TAKING PLACE OR IN BUILDING UNDERGOING ALTERATION OR REPAIR THAT DO NOT RESULT IN THE REMOVAL OF INTERIOR WALL OR CEILING FINISHES, UNLESS THER IS AN ATTIC, CRAWL SPACE OR BASEMENT WHICH COULD PROVIDE ACCESS TO WIRING.
C) SMOKE ALARM SHALL BE INTERCONNECTED SUCH THAT THE ACTIVATION OF ONE ALARM WILL ACTIVATE ALL ALARMS IN THE INDIVIDUAL DWELLING UNIT.
D) SMOKE DETECTORS SHALL BE "HARD WIRED" AND SHALL BE EQUIPPED WITH BATTERY BACKUP.

CARBON MONOXIDE ALARM REQUIREMENTS:
A) AN APPROVED CARBON MONOXIDE ALARM SHALL BE INSTALLED FOR NEW CONSTRUCTION AND ALTERATION, REPAIR OR ADDITIONS REQUIRING PERMIT EXCEEDING $1000.
B) CO ALARMS SHALL BE "HARD WIRED" AND SHALL BE EQUIPPED WITH BATTERY BACKUP.
C) CO ALARMS SHALL BE LISTED FOR COMPLIANCE WITH UL 2034, UL 217, UL 2075 AND MAINTAINED PER NFPA 720.
D) CO ALARMS SHALL BE INSTALLED OUTSIDE OF EACH SLEEPING AREA IN THE IMMEDIATE VICINITY OF THE BEDROOMS AND ON EVERY LEVEL FOR A DWELLING UNIT INCLUDING BASEMENT.
E) CO ALARM SHALL BE INTERCONNECTED SUCH THAT THE ACTIVATION OF ONE ALARM WILL ACTIVATE ALL ALARMS IN THE INDIVIDUAL DWELLING UNIT.
F) IN EXISTING DWELLING UNIT, A CO ALARM IS PERMITTED TO BE BATTERY OPERATED WHERE REPAIR OR ALTERATION DO NOT RESULT IN THE REMOVAL OF WALL OR CEILING FINISHES.

FIRE PROTECTION
1. SMOKE DETECTORS SHALL BE PROVIDED IN EACH SLEEPING ROOM, ON THE CEILING OR WALL IMMEDIATELY OUTSIDE OF EACH SLEEPING ROOM AND ON EACH STORY AND BASEMENT FOR DWELLINGS WITH MORE THAN ONE STORY. (907.2.11.2, R314.3)
2. THE POWER SOURCE FOR SMOKE DETECTORS SHALL BE AS FOLLOWS:
A) IN NEW CONSTRUCTION SMOKE DETECTORS SHALL RECEIVE THEIR PRIMARY POWER FROM THE BUILDING WIRING AND SHALL BE EQUIPPED WITH A BATTERY BACKUP. (907.2.11.4, R314.4)
B) IN EXISTING SFD, SMOKE DETECTORS MAY BE BATTERY OPERATED. (907.2.11.5, R314.4)

PLAN NOTES

1. VERIFY IN-FIELD ACCURACY OF GRID LINES. REPORT TO ARCHITECT ANY DISCREPANCIES BETWEEN DRAWINGS AND FIELD CONDITION.
2. SEE SHEET A-0.0 FOR SYMBOLS & ABBREVIATIONS.
3. WHEN PROVIDED, SEE CIVIL PLANS FOR THE BUILDING LOCATION ON SITE AND PRECISE GRADING PLANS.
4. ALL DIMENSIONS ARE TO FACE OF MASONRY/CONCRETE, STUD, OR CENTERLINE OF COLUMN.
5. PROVIDE FIRE BLOCKING IN CONCEALED SPACES OF STUD WALLS, INCLUDING FURRED SPACES, AT 10' INTERVALS BOTH VERTICALLY AND HORIZONTALLY.
6. WHEN PROVIDED, SEE STRUCTURAL DRAWINGS FOR BUILDING SECTION.
7. SIZE AND LOCATION OF FRAMING AND PLYWOOD SHEATHING.
8. SPECIAL NAILING AND BLOCKING REQUIREMENTS.
9. PROVIDE ALL NECESSARY CEILING OR WALL ACCESS PANELS AS REQUIRED FOR AIR CONDITIONING, PLUMBING, FIRE SPRINKLER AND ELECTRICAL SYSTEMS. IN FIRE RATED ASSEMBLIES PROVIDE RATED ACCESS PANELS WITH SELF CLOSING DEVICES.
10. FOR DOOR & WINDOW SCHEDULE - SEE SHEET A7.5 AND A7.5A
11. GREEN NOTES: [illegible]
12. THE HEATING AND AIR CONDITIONING SYSTEM SHALL BE SIZED AND DESIGNED [illegible]
13. EXHAUST FANS SHALL BE ENERGY STAR COMPLIANT AND BE DUCTED TO TERMINATE TO THE OUTSIDE OF THE BUILDING.
14. FANS, NOT FUNCTIONING AS A COMPONENT OF A WHOLE HOUSE VENTILATION SYSTEM, MUST BE CONTROLLED BY A HUMIDITY CONTROL.

GENERAL NOTES

LR/A
LR/A ARCHITECTURE
Architecture
Planning
Interior Design
Construction Management

PROJECT
ADDITION & ADU
ADDITION - 5316 S ASCOT AVE
ADU - 5316 1/2 S ASCOT AVE
LOS ANGELES CA 90011

CLIENT
MARTIN & ROSA VILLALOBOS
5316 S ASCOT AVE
LOS ANGELES CA 90011

REVISIONS
| ISSUE | DATE | DESCRIPTION |
|---|---|---|
| 1 | 10/4/2022 | [illegible] |
| 2 | 11/15/2022 | SANITATION |
| 3 | 1/13/2022 | SANITATION |

DRAWN
STAFF

JOB NO.
21.599.00

DATE
1/18/2022

SCALE
AS SHOWN

TITLE
FIRST FLOOR PLAN

SHEET


SECOND FLOOR PLAN
PLAN NOTES
KEYNOTES
LEGEND
BEDROOM
LR/ARCHITECTURE
ADDITION & ADU
MARTIN & ROSA VILLALOBOS
LOS ANGELES CA 90011
SECOND FLOOR PLAN



ROOF PLAN 1
SCALE: 1/4" = 1'-0"

1. (N) ASPHALT SHINGLES [illegible]
2. (N) TOP OF RIDGE
3. (N) WALL BELOW
4. (N) GUTTER
5. (N) DOWNSPOUT
6. (N) EAVE VENT (TYP.)
7. (N) GABLE VENT (TYP.)
8. RAIN TANKS
9. (N) WOODEN DECK

NOTE:
[illegible] ROOF COVERING INSTALLATION SHALL BE IN ACCORDANCE WITH MANUFACTURER'S SPECIFICATIONS

## KEYNOTES

EXHAUST FAN
SLOPE DIRECTION

## LEGEND

1. IN CONCEALED SPACES OF STUD WALLS AND PARTITIONS, INCLUDING FURRED SPACES AT THE CEILING AND FLOOR LEVELS AND AT 10 FOOT INTERVALS BOTH VERTICAL AND HORIZONTAL.
2. AT ALL INTERCONNECTIONS BETWEEN CONCEALED VERTICAL AND HORIZONTAL SPACES SUCH AS OCCUR AT SOFFITS, DROP CEILINGS AND COVE CEILINGS.
3. IN CONCEALED SPACES BETWEEN STAIR STRINGERS AT THE TOP AND BOTTOM OF THE RUN AND BETWEEN STUDS ALONG AND IN LINE WITH THE RUN OF THE STAIRS IF THE WALLS UNDER THE STAIRS ARE UNFINISHED.
4. IN OPENINGS AROUND VENTS, PIPES, DUCTS, CHIMNEYS, FIREPLACES AND SIMILAR OPENINGS WHICH AFFORD A PASSAGE FOR FIRE AT CEILING AND FLOOR LEVELS, WITH NONCOMBUSTIBLE MATERIALS, AND
5. AT OPENINGS BETWEEN ATTIC SPACES AND CHIMNEY CHASES FOR FACTORY BUILT CHIMNEYS.

## FIRE BLOCKING NOTES

1. CONTRACTOR SHALL PROVIDE AND INSTALL ROOFING IN ACCORDANCE WITH GAF ASTM SPECIFICATION NO [illegible] OR APPROVED EQUAL.
2. CONTRACTOR SHALL PROVIDE AND INSTALL ROOFING IN ACCORDANCE WITH THE SYSTEM MANUFACTURER'S REQUIREMENTS FOR A CLASS A FIRE RETARDANT ROOFING, THAT CAN BE GUARANTEED FOR TWELVE YEARS WHEN INSTALLED UNDER MANUFACTURER'S OBSERVATION, COMPLYING WITH STATUTORY REQUIREMENTS AT THE PLACE OF CONSTRUCTION.
3. CONTRACTOR SHALL PROVIDE WRITTEN CERTIFICATION TO THE ARCHITECT THAT APPLICATOR IS APPROVED BY SYSTEM MANUFACTURER.
4. THE OWNER RESERVES THE RIGHT TO EMPLOY A ROOFING CONSULTANT FOR THE PURPOSE OF FIELD OBSERVATION AND TESTING AND TO ADVISE OWNER AND CONTRACTOR REGARDING COMPLIANCE OF THIS WORK WITH THE CONTRACT REQUIREMENTS FOR AND RELATED TO ROOFING.
5. CONTRACTOR SHALL PROVIDE SYSTEM MANUFACTURER'S WRITTEN APPROVAL OF MODIFICATIONS CONTAINED HEREIN OF THEIR REQUIREMENTS FOR THE SPECIFIED SYSTEMS.
6. CONTRACTOR SHALL INSTALL INTERPLIES, CAP SHEET AND BASE FLASHING IN A MANNER TO ACHIEVE, AS NEARLY AS POSSIBLE, AN UNIFORM FILM OF ASPHALT, FREE OF VOIDS, BETWEEN EACH LAYER. CONTRACTOR IS RESPONSIBLE FOR METHOD OF ACHIEVING THIS RESULT.
7. ALL ROOF PENETRATIONS SHALL NOT BE CLOSER THAN 18" TO CURBS, CRICKETS, WALLS ETC.
8. CONTRACTOR TO REMOVE ALL EXISTING MECHANICAL UNITS AND ACCESSORIES.

1. THE FOLLOWING ITEMS SHALL COMPLY WITH SPECIFIC I.C.C. HOLDOWNS, STRAPS, FRAMING CLIPS, RETROFIT ANCHOR BOLTS, SHEAR PLATES, JOIST HANGERS.
2. ICBO EVALUATION REPORTS OR LARR'S ARE ACCEPTABLE FOR THE FOLLOWING NON STRUCTURAL ITEMS: PROVIDE REPORT NUMBER, ROOFING TILE.
3. DRAFT STOPS SHALL BE PROVIDED WITHIN A CONCEALED FLOOR CEILING ASSEMBLY FORMED OF COMBUSTIBLE CONSTRUCTION (1000 S.F. AND 60 MAX BETWEEN DRAFT STOPS).
4. DRAFT STOPS SHALL BE PROVIDED WITHIN ATTICS, MANSARDS, OVERHANGS AND SIMILAR CONCEALED SPACES FORMED OF COMBUSTIBLE CONSTRUCTION (3000 S.F. AND 60' MAX.)
5. NOTCHING OF EXTERIOR AND BEARING/NON BEARING WALLS SHALL NOT EXCEED 25% / 40% OF ITS WIDTH, RESPECTIVELY. BORED HOLES IN BEARING/NON BEARING WALLS SHALL NOT EXCEED 40% / 60% OF ITS WIDTH RESPECTIVELY.
6. PROVIDE FIRE BLOCKING IN CONCEALED SPACES OF STUD WALLS, PARTITIONS, INCLUDING FURRED SPACES AT THE CEILING AND FLOOR LEVEL AND AT 10 FOOT INTERVALS BOTH VERTICAL AND HORIZONTAL.
7. WHERE FLASHING IS OF METAL, THE METAL SHALL BE CORROSION RESISTANT WITH A THICKNESS OF NOT LESS THAN .019 IN (NO. 26 GALVANIZED SHEET)
8. ROOF DIAPHRAGM NAILING TO BE INSPECTED BEFORE COVERING. FACE GRAIN OF PLYWOOD SHALL BE PERPENDICULAR TO SUPPORTS.

## ATTIC VENT CALCULATIONS

ATTIC VENTS CALCULATIONS

ROOF AREA
ZONE 1: [illegible]
ZONE 2: [illegible]

REQ. [illegible]

ATTIC VENTS PROVIDED

ATTIC VENTS REQ. [illegible] SQ. IN.

4 [illegible] EAVE VENTS AT [illegible] SQ. IN. EACH = [illegible] SQ. IN. PROVIDED

1 [illegible] GABLE VENTS AT [illegible] SQ. IN. EACH = [illegible] SQ. IN. PROVIDED

TOTAL VENT NET FREE AREA PROVIDED [illegible] SQ. IN.

BMP CALCULATION

ROOF AREA FOR [illegible] = [illegible] GAL REQUIRED

5 x 130 GAL TANK = [illegible] TANK PROVIDED

[illegible]

LR/A
LR/A ARCHITECTURE
Architecture
Planning
Interior Design
Construction Management
[illegible]

SUBMITTALS / DATE / DESCRIPTION
PRE-BID
BLDG. DEPT.
BID SET

RELEASE NO. / DATE / DESCRIPTION

ARCH/CONSULTANT

LICENSED ARCHITECT
STATE OF CAL

PROJECT
ADDITION & ADU
ADDITION - 5310 S ASCOT AVE
ADU - 5316 1/2 S ASCOT AVE
LOS ANGELES CA 90011

CLIENT
MARTIN & ROSA VILLALOBOS
5316 S ASCOT AVE
LOS ANGELES CA 90011

| REVISIONS ISSUE | DATE | REVISION |
|---|---|---|
| | 10/4/2021 | BUILDING & SAFETY |
| | 11/23/2021 | SANITATION |
| | 1/3/2022 | SANITATION |

DRAWN: STAFF
CHECKED: WR / RM
CAD FILE
JOB NO. 21.599.00
DATE 1/14/2022
SCALE AS SHOWN
TITLE
ROOF PLAN
SHEET


SOUTH ELEVATION
1
NORTH ELEVATION
2
EAST ELEVATION
3
WEST ELEVATION
4
PROPERTY LINE
MAX HEIGHT
KEYNOTES
NOTES
FIRE SEPARATION CALCULATIONS
ADDITION & ADU
MARTIN & ROSA VILLALO
LOS ANGELES CA 90011
21,696.00
1/14/2022
AS SHOWN
EXTERIO
ELEVATI
EXHIBIT A - 6/10


LONGITUDINAL SECTION
2
TO RIDGE
TO TOP PLATE
WINDOW HEADER
FINISH FLOOR
FINISH GRADE
MAX HEIGHT
KEYNOTES
ROOF RAFTER
EXTERIOR WALLS
FLOOR
LR/A
LR/ARCHITECTURE
Architecture
Planning
Interior Design
Construction Management
ADDITION & ADU
ADDITION - 5316 S ASCOT AVE
ADU - 5318 1/2 S ASCOT AVE
LOS ANGELES CA 90011
MARTIN & ROSA VILLALOBOS
5316 S ASCOT AVE
LOS ANGELES CA 90011
DRAWN
STAFF
CAD FILE
JOB NO.
21.599.00
DATE
1/14/2022
SCALE
AS SHOWN
TITLE
BUILDING SEC
SHEET


HEAD FLASHING DETAIL
17
ATION DETAIL
18
EXT. DOOR & PAN FLASHING DETAIL
14
CORNER OPENING REINFORCEMENT
15
DOOR SCHEDULE
3
WINDOW SCHEDULE
A
B
C
LR/A
LR/A ARCHITECTURE
EXHIBIT
ADDITION & A
MARTIN & ROSA VI
LOS ANGELES CA
STAFF
AS SHOWN
DOOR & W
SCHEDUL
DETAILS

LR/A

LR/A ARCHITECTURE

Architecture
Planning
Interior Design

Construction Management

ARCH/CONSULTANT:

PROJECT:

ADDITION & ADU
ADDITION - 5316 S ASCOT AVE
ADU - 5316 1/2 S ASCOT AVE
LOS ANGELES CA 90011

CLIENT:

MARTIN & ROSA VILLALOBOS
5316 S ASCOT AVE
LOS ANGELES CA 90011

REVISIONS:

| ISSUE | DATE | REVISION |
|---|---|---|
| 1 | 10/4/2021 | BUILDING & SAFETY |
| 2 | 11/26/2021 | SANITATION |
| 3 | 1/3/2022 | SANITATION |

DRAWN: STAFF

CAD FILE:

JOB NO.: 21.599.00

DATE: 1/14/2022

SCALE: AS SHOWN

TITLE: TITLE 24

SHEET: A-8.0

...T AVE.,
...ES CA 90011

PRECISION BUILDING CONSULTANTS, INC. PBCS911@GMAIL.COM
3710 TURNBULL CYN RD., HACIENDA HTS, CA 91745

PAGE: 1 OF 2


FRAMING PLAN
2ND FLOOR FRAMING PLAN
FOUNDATION PLAN
DAVID LI & ASSOCIATES
JOB LOCATION:
5316 Ascot Ave

# EXHIBIT 2

IVY GREEN
Construction & Engineering, Inc.
16000 Ventura Blvd., PH 1203
Encino, CA 91436
(818) 488-6168

February 22, 2023

Rosa & Martin Villalobos
5318 1/2 Ascot Ave.
Los Angeles, CA 90011

**Contract:** Provide architectural and engineering plans for a supplemental permit at 5318 1/2 Ascot Ave., Los Angeles, CA 90011, to convert the deck into a roof, revise the site plan, and reconfigure the LID layout. Included: Permit expediting. Excluded: Blueprints, Title 24, and Municipal Fees.

**Project ID:** 5318 1/2 Ascot Ave ; **Project No:** 22-174

Mr. & Mrs. Villalobos,

Ivy Green Construction & Engineering, Inc., hereon forward will be referred to as "*Ivy Green*", would like to thank you for asking us to provide you with proposal for above referenced project. Present herewith is *Ivy Green*'s evaluation of the scope of work and fees anticipated to complete the tasks.

**Article 1, Assumptions/Parameters**

1. Our analysis will be based on CBC 2022 part 2, volume 2.
2. Only a linear static lateral analysis will be required for the seismic analysis, and the diaphragms can be assumed rigid or flexible for lateral design.
3. There are no existing subterranean structures that would affect the structural design.
4. *Ivy Green* will process building department submittals for permit.
5. The CLIENT will provide *Ivy Green* with existing plans in CAD, DXF, or REVIT format for use as our backgrounds (if applicable).
6. The CLIENT will provide *Ivy Green* with a set of record structural drawings with necessary existing structural information.
7. The CLIENT will provide *Ivy Green* with a geotechnical report with required information for foundation design, stamped and signed by a licensed professional engineer (if applicable).
8. The foundation design will consist of a conventional shallow footing system.
9. We only observe those items of the building that are readily accessible, not requiring special equipment and demolition, and those items that are not covered by architectural finishes, waterproofing, heavy furniture, and equipment....etc. There is no claim, either stated or implied, that all conditions will be observed.
10. Our scope will not include testing materials used in construction. We assume the materials are satisfactory to the design specifications.
11. We do not check the internal structure of the elements being anchored, such as mechanical units, and prefabricated architectural elements. We assume that the elements are internally structurally adequate for seismic and wind loads.
12. Post tensions slabs, were they are used, shall be engineered and detailed by another firm, specializing in PT slabs, and employed by the DEVELOPER.
13. Design/build and differed submittals shall include:
    a. Metal studs: interior, exterior, bearing, and non-bearing.
    b. Curtain wall, window wall, louver, and glazing systems.
    c. Steel stairs, handrails, guardrails, and landings.
    d. Fire sprinkler support.
    e. Ladders, gates, gate footing, and metal grating.
    f. Anchorage of equipment and components for mechanical, electrical, plumbing, etc. less than 400lbs.
    g. Signage.

h. Storage racks, cabinets, counters and shelves
i. Veneer anchorage systems.
j. Glass guardrail and bracket assemblies.
k. Prefabricated trusses, and commercial joists
l. Prefabricated mounted awnings and eyebrows

**Article 2, Basic Services**

1. Design coordination with the other design professionals to ensure design intent is feasible.
2. Structural design and analysis in a Calculations packages.
3. Signing and sealing of the structural drawings and calculations.
4. Structural Drawings for permit and construction.
5. Correspondence with Building Department Officials during the Plan check process.
6. Attendance to a maximum of three local value engineering or coordination meetings.
7. Correspondence with contractors in the form of RFIs for clarifications and omissions.
8. Review and mark up the shop drawings and submittals as required by the Building department, and/or specifications.
9. Outline specification of structural materials in short form on our drawings.

**Article 3, Exclusions and Additional services**

The following services are not contemplated to be included within the scope of fee. These items may be added to the scope for an additional fee: Expediter at $50/hr and Junior Engineer at $125/hr

1. Acquisition of reports, and/or drawings from other professionals, and Project management.
2. Soil engineering, civil engineering and site survey.
3. Detection or remediation of hazardous materials.
4. Mechanical, Electrical and Plumbing engineering.
5. Cost estimate and project schedule.
6. Means and methods of construction.
7. Workers safety and procedures.
8. Design and details of site work like ornamental structures, except for those items specifically listed in scope.
9. Re-design due to new soil parameters.
10. Re-design due to changes in the architectural dimensions, elevations, or rooflines.
11. Long form specifications booklet.
12. 'As-built' or 'Record' drawings.
13. Field verification of existing site conditions.
14. Field verification of existing construction.
15. Hydrology calculations.
16. Construction engineering, shoring of temporary conditions, and temporary earth retaining walls.
17. Core drilling, concrete scanning, and material testing
18. Anchorage and stability of those elements and equipment less than 400 lbs and has a center of mass less than 48" tall.
19. Additional meetings, structural observations as not specified within article 2.
20. Plan check and other jurisdictional fees.

**Article 4, Compensation**

We will complete our scope for a fix fee of $2,800.00 for the services outline in article 2. Acceptable forms of payments are cash or checks made payable to *Ivy Green Construction & Engineering, Inc*. Payments via Zelle can be made using the following email: **contact@ivygreenconstruction.com.** Compensation shall be due base upon progress of the work as follows:

| | | |
|---|---|---|
| 1 | Retainer prior to start of work | $2,000.00 |
| 2 | Upon completion of plans / Submit to City | $800.00 |
| 3 | Upon completion of Municipal Corrections (if any) | $0.00 |
| 4 | | |
| 5 | | |

**Article 6, General Conditions**

Unless this offer is previously accepted, it will be withdrawn automatically at 5pm, 60 days from the date of issue.

**Contract:** These Contract Provisions and the accompanying Proposal constitute the full and complete Agreement between the parties and may be changed, amended, added to, superseded, or waived only if both parties specifically agree in writing to such amendment of the Agreement. In the event of any inconsistency between these Contract Provisions and any proposal, contract, purchase order, requisition, notice to proceed, or like document, these Contract Provisions shall govern.

**Right of Entry:** When entry to property is required for *Ivy Green* to perform its services, the CLIENT agrees to obtain legal right of entry on the property.

**Documents:** All reports, notes, drawings, specifications, data, calculations, and other documents, including those in electronic form, prepared by *Ivy Green* are instruments of *Ivy Green*'s service that shall remain *Ivy Green*'s property. The CLIENT agrees not to use *Ivy Green* -generated documents for marketing purposes, for projects other than the project for which the documents were prepared by *Ivy Green*, or for future modifications to this project, without *Ivy Green*'s express written permission. Any reuse or distribution to third parties without such express written permission or project-specific adaptation by *Ivy Green* will be at the CLIENT's sole risk and without liability to *Ivy Green* or its employees, and contractors. CLIENT shall, to the fullest extent permitted by law, defend, indemnify, and hold harmless *Ivy Green* from and against any and all costs, expenses, fees, losses, claims, demands, liabilities, suits, actions, and damages whatsoever arising out of or resulting from such unauthorized reuse or distribution.

**Construction Phase Services:** If *Ivy Green* performs any services during the construction phase of the project, *Ivy Green* shall not supervise, direct, or have control over Contractor's work. *Ivy Green* shall not have authority over or responsibility for the construction means, methods, techniques, sequences or procedures or for safety precautions and programs in connection with the work of the Contractor. *Ivy Green* does not guarantee the performance of the construction contract by the Contractor and does not assume responsibility for the Contractor's failure to furnish and perform its work in accordance with the Contract Documents.

**Standard of Care:** *Ivy Green* and its employees, contractors, and subcontractors will exercise that degree of care and skill ordinarily practiced under similar circumstances by professional engineers providing similar services. CLIENT agrees that services provided will be rendered without any warranty, express or implied. *Ivy Green* shall exercise usual and customary professional care in its efforts to comply with applicable codes, regulations, laws rules, ordinances, and such other requirements in effect as of the date of execution of this Agreement.

**Opinion of Probable Costs:** When required as part of its work, *Ivy Green* will furnish opinions of probable cost, but does not guarantee the accuracy of such estimates. Opinions of probable cost, financial evaluations, feasibility studies, economic analyses of alternate solutions, and utilitarian considerations of operations and maintenance costs prepared by *Ivy Green* hereunder will be made on the basis of *Ivy Green*'s experience and qualifications and will represent *Ivy Green*'s judgment as an experienced and qualified consultant. However, users of the probable cost opinions must recognize that *Ivy Green* does not have control over the cost of labor, material, equipment, or services furnished by others or over market conditions or contractors' methods of determining prices or performing the work.

**Suspension of Work:** The CLIENT may, at any time, by written notice, suspend further work by *Ivy Green*. The CLIENT shall remain liable for, and shall promptly pay *Ivy Green* for all services rendered to the date of suspension of services, plus suspension charges, which shall include the cost of assembling documents, personnel and equipment, rescheduling or reassignment, and commitments made to others on CLIENT's behalf. CLIENT shall pay *Ivy Green* pursuant to the rates and charges set forth in the Proposal. *Ivy Green* will submit monthly invoices to CLIENT for services rendered and expenses incurred. If the project is suspended for more than thirty (30) calendar days in the aggregate, *Ivy Green* shall be compensated for services performed and charges incurred prior to receipt of notice to suspend, and, upon resumption, an equitable adjustment in fees to accommodate the resulting demobilization and remobilization costs. In addition, there shall be an equitable adjustment in the project schedule based on the delay caused by the suspension. If the project is suspended for more than ninety (90) calendar days in the aggregate, *Ivy Green* may, at their option, terminate this Agreement upon giving notice in writing to Client. CLIENT agrees to waive any claim against *Ivy Green*, and to indemnify and hold harmless *Ivy Green* from any claim or liability resulting from such suspension. If Client fails to make payments when due or otherwise is in breach of this Agreement, *Ivy Green* may suspend performance of services upon five (5) calendar days' notice to the Client. *Ivy Green* shall have no liability whatsoever to Client for any costs or damages as a result of such suspension caused by any breach of this Agreement by Client.

**Liability:** To the extent permitted by law, the total liability, in the aggregate, of Design Professional and Design Professional's officers, directors, members, partners, agents, employees, and sub-consultants, to Client, its subsidiary and/or affiliated companies and their respective officers, directors, employees, agents and anyone claiming by, through, or under Client, for any and all injuries, claims, losses, expenses, or damages whatsoever arising out of, resulting from or in any way related to Design Professional's services, the Project or this Agreement, or any Addenda, from any cause or causes whatsoever, including but not limited to, negligence, strict liability, breach of express or implied contract or warranty shall not exceed the available proceeds of insurance coverage, or cash in corporate accounts to the extent not available from proceeds of insurance.

**Indemnification:** *Ivy Green* agrees to indemnify and hold harmless the CLIENT, its officers, directors, partners, and employees from and against any damages, losses, liabilities, expenses, and costs (including reasonable attorneys' fees) arising out of the death or bodily injury to any person or destruction or damage to any property, to the extent caused by *Ivy Green* 's

negligent acts, errors or omissions in the performance of professional services under this Agreement and those of *Ivy Green*'s contractors or anyone for whom *Ivy Green* is legally liable. Notwithstanding any language to the contrary in this Article, *Ivy Green* shall only be required to reimburse CLIENT for defense fees and costs including attorney's fees, in proportion to *Ivy Green*'s proven acts of negligence and further, only to the extent such fees and costs were directly attributable to CLIENT's defense of a suit based on *Ivy Green*'s actual negligence. In no event shall the indemnification obligation extend beyond the date when the institution of legal or equitable proceedings for professional negligence would be barred by any applicable statute of repose or statute of limitations. *Ivy Green* is not obligated to indemnify the CLIENT for the CLIENT's own negligence or willful misconduct. It is intended by the parties to this Agreement that Design Professional's services in connection with the Project shall not subject *Ivy Green*'s individual employees, officers or directors to any personal legal exposure for the risks associated with the Project or this Agreement, or any Addenda. Therefore, and notwithstanding anything to the contrary contained herein, Client agrees that as Client's sole and exclusive remedy, any claim, demand or suit shall be directed and/or asserted only against *Ivy Green*'s, a California corporation, and not against any of Design Professional's individual employees, officers or directors.

**Governing Law:** The laws of the state in which *Ivy Green* office executing this Agreement is located shall govern the validity and interpretation of this Agreement.

**Invalid Terms:** In the event any of these Contract Provisions are found to be illegal or otherwise unenforceable, the unenforceable Contract Provision will be stricken. Striking such a Contract Provision shall have no effect on the enforceability of the remaining Contract Provisions and those remaining Contract Provisions shall continue in full force and effect as if the unenforceable Contract Provision were never included in the Agreement. Where a provision of the Prime Agreement is inconsistent with a provision of this Agreement, this Agreement shall govern.

**Mediation:** The CLIENT and *Ivy Green* agree to submit all claims and disputes arising out of this Agreement to non-binding mediation prior to the initiation of legal proceedings. This provision shall survive completion or termination of this Agreement; however, neither party shall seek mediation of any claim or dispute arising out of this Agreement beyond the period of time that would bar the initiation of legal proceedings to litigate such claim or dispute under the applicable law.

**Certifications:** *Ivy Green* shall not be required to sign any documents, no matter by whom requested, that would result in *Ivy Green* 's having to certify, guaranty, or warrant the existence of conditions that *Ivy Green* cannot ascertain. There is no implied warranty as to the final construction.

**Third Parties:** Nothing contained in this Agreement shall create a contractual relationship with, or a cause of action in favor of, a third party against either the CLIENT or *Ivy Green*. *Ivy Green*'s services hereunder are being performed solely for the benefit of the CLIENT, and no other entity shall have any claim against *Ivy Green* because of this Agreement or *Ivy Green*'s performance of services hereunder.

**Consequential Damages:** Neither the CLIENT nor *Ivy Green* shall be liable to the other or shall make any claim for any incidental, indirect or consequential damages arising out of, or connected in any way to the Project or this Agreement. This mutual waiver includes, but is not limited to, damages related to loss of use, loss of profits, loss of income, loss of reputation, unrealized savings or diminution of property value and shall apply to any cause of action including negligence, strict liability, breach of contract and breach of warranty.

**Transmission of agreement:** Faxed or scanned and emailed signatures shall be treated as originals. Transmit the entire agreement, not just the signature page.

**Additional Services:** If the services covered by this Agreement have not been completed within thirteen months of the date of this Agreement, through no fault of *Ivy Green*, extension of the *Ivy Green*'s services beyond that time shall be compensated as Additional Services.

**Delay beyond reasonable control:** Neither party shall be deemed in default of this agreement to the extent that any delay or failure in the performance of its obligations results from any cause beyond its reasonable control and without its negligence.

**Differed engineering :** Should differed engineering be used such as pre-fabricated trusses, pre-fabricated metal building, post tension foundation, or any other differed element, be utilized and designed by an engineer retained and reimbursed by other than *Ivy Green*, said engineer shall be primarily responsible for this work. *Ivy Green* shall not be liable for negligent acts, errors or omissions made by CLIENT'S ENGINEER, or CLIENT'S CONTRACTOR ENGINEER, employee, including employee agents or sub-consultant, or anyone for whom CLIENT'S ENGINEER, or CLIENT'S CONTRACTOR ENGINEER is legally liable. CLIENT further agrees to waive any claim against *Ivy Green*, and to indemnify and hold harmless *Ivy Green* from any claim or liability arising from such errors or negligence arising from such differed engineering.

**Copies of documents:** Copies of documents that may be relied upon by CLIENT are limited to the printed copies (also known as hard copies) that are signed and sealed by *Ivy Green*. Files in electronic media format or text, data, graphic or other types that are furnished by *Ivy Green* to CLIENT are only for convenience of CLIENT. Any conclusion or information obtained or derived from such electronic files will be at the user's sole risk. When transferring documents in electronic media format, *Ivy Green* makes no representations as to long term compatibility, usability, or readability of documents resulting from the use of software application packages, operating systems or computer hardware differing from those in use by *Ivy Green* at the beginning of this assignment. The CLIENT agrees waive any claim against *Ivy Green* and to indemnify and hold harmless *Ivy Green* from any claim or liability resulting from parties unauthorized re-use of documents.

**Contactor's responsibility:** It is understood that the contractor, not *Ivy Green*, is responsible for the construction of the project, and that *Ivy Green* is not responsible for the acts, errors or omissions of any contractor, sub-contractor or materials

supplier; for safety precautions, programs or enforcement; or for construction means, methods, techniques, sequences and procedures employed by the contractor. CLIENT recognizes that the contractors CLIENT selects may commit errors, omissions, or other acts that lead to claims and that *Ivy Green* may be claimed against as well, because actual responsibility will not be determinable until discovery is complete. Because some of *Ivy Green*'s employees may have to bear personal liability in such cases, a risk to which contractor's employees are immune; because, historically, many contractors have declared bankruptcy or dissolved their business in order to escape liability, an action that significantly increases *Ivy Green*'s risk; and because CLIENT selects contractors, CLIENT agrees to reimburse *Ivy Green* for any settlement or judgment *Ivy Green* is required to pay beyond that amount which *Ivy Green*'s extent of culpability otherwise would require.

**Site observation:** It is agreed that the professional services of *Ivy Green* do not extend to or include the review or site observation of the contractor's work or performance unless specifically listed in Article 2. CLIENT further agrees to waive any claim against *Ivy Green*, and to defend, indemnify and hold harmless *Ivy Green* from any claim or liability arising or alleged to have arisen from Site observation. It is further agreed that the CLIENT will defend, indemnify and hold harmless *Ivy Green* from any claim or liability, arising from GENERAL CONTRACTOR'S performance, or failure of GENERAL CONTRACTOR'S work or alleged to have arisen from the GENERAL CONTRACTOR'S performance or the failure of the GENERAL CONTRACTOR'S work to conform to the design intent and the contract documents. CLIENT is not obligated to indemnify *Ivy Green* for the *Ivy Green*'s own negligence. Observation differs from inspection in that "observation" is defined as "the act of viewing or noting something, for scientific or other special purpose"; inspection is defined as "an especially careful or critical viewing of something".

**IVY GREEN reliance:** *Ivy Green* shall indicate to the CLIENT the information needed for rendering of services hereunder. The CLIENT shall provide to *Ivy Green* such information as is available to the CLIENT and *Ivy Green*'s contractors, and *Ivy Green* shall be entitled to rely upon the accuracy and completeness thereof. The CLIENT recognizes that it is impossible for *Ivy Green* to assure the accuracy, completeness and sufficiency of such information either because it is impossible to verify, or because of errors or omissions which may have occurred in assembling the information the CLIENT is providing. Accordingly, the CLIENT agrees, to the fullest extent permitted by law, to indemnify and hold harmless *Ivy Green*, and *Ivy Green*'s employees and contractors from any claim, liability or cost (including reasonable attorneys' fees and costs of defense) for injury or loss arising or allegedly arising from errors, omissions or inaccuracies in documents or other information provided by the CLIENT to the *Ivy Green*.

**Termination:** Termination for Convenience: *Ivy Green* and Client may terminate this Agreement for convenience upon thirty (30) days written notice delivered or mailed to the other party. Termination for Cause: In the event of material breach of this Agreement, the party not breaching the Agreement may terminate if upon ten (10) days written notice delivered or mailed to the other party, which termination notice shall state the basis for the termination. The Agreement shall not be terminated for cause if the breaching party cures the breach within the ten day period.

Respectfully submitted,

[signature]

Byron Valencia
Founder/Owner
Professional Engineer No. C87372

I acknowledge having read this letter and the proposal contained therein, and agree to its terms and conditions. If this a contract with a corporation, estate or any other type of legal entity, I attest that I am an authorized to act on the behalf of the said organization. I hereby authorized you to commence work on this project.

Rosa & Martin Villalobos
5318 1/2 Ascot Ave
Los Angeles, CA 90011

By: Rosa Villalobos

Date: 2/27/23

# EXHIBIT 3

**Ivy Green Construction & Engineering, Inc.**
16000 Ventura Blvd., PH 1203
Encino, CA 91436
(818) 488-6168
contact@ivygreenconstruction.com
www.ivygreenconstruction.com

# Estimate

**ADDRESS**
Rosa Villalobos
5316 Ascot Ave.
Los Angeles, CA 90011

**ESTIMATE #** 285
**DATE** 06/28/2023

| DATE | | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|---|
| 06/28/2023 | **Engineering Services** | Revise deck to pitched roof. | 0 | 125.00 | 0.00 |
| 06/28/2023 | **Engineering Services** | Revised site plan dimensions. | 0 | 125.00 | 0.00 |
| 06/28/2023 | **Engineering Services** | Repositioned Rain Barrels to rear of structure. | 0 | 125.00 | 0.00 |
| 06/28/2023 | **Engineering Services** | Rerouted downspouts to reach the rear of structure. | 0 | 125.00 | 0.00 |
| 06/28/2023 | **Engineering Services** | Added (1) bathroom window in the ADU. | 0.50 | 125.00 | 62.50 |
| 06/28/2023 | **Engineering Services** | Added (1) bathroom window in the Addition. | 0.50 | 125.00 | 62.50 |
| 06/28/2023 | **Engineering Services** | Added laundry room to the existing main residence. | 0.75 | 125.00 | 93.75 |
| 06/28/2023 | **Engineering Services** | Revised the kitchen layout. | 0.25 | 125.00 | 31.25 |
| 06/28/2023 | **Engineering Services** | Increased the stairs width. | 0.50 | 125.00 | 62.50 |
| 06/28/2023 | **Engineering Services** | Increased the upstairs landing width. | 0.50 | 125.00 | 62.50 |
| 06/28/2023 | **Engineering Services** | Added Arch to the living room. | 0.25 | 125.00 | 31.25 |
| 06/28/2023 | **Engineering Services** | Increased entry door from 36" to 40". | 0.25 | 125.00 | 31.25 |
| 06/28/2023 | **Engineering Services** | Added a 40" laundry door. | 0.25 | 125.00 | 31.25 |
| 06/28/2023 | **Engineering Services** | Revised the hallway for the Addition. | 1 | 125.00 | 125.00 |
| 06/28/2023 | **Engineering Services** | Remove the entry leading to the former deck. | 0.25 | 125.00 | 31.25 |
| 06/28/2023 | **Engineering** | Revised Title 24 to account for the lack | 0.25 | 125.00 | 31.25 |

Thank you for your business!

| DATE | ACTIVITY | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|---|
| | Services | of A/C in the upstairs unit. | | | |
| 06/28/2023 | Engineering Services | Incorporate survey report to the plans. | 2 | 125.00 | 250.00 |
| 06/28/2023 | 4.1 - Rough Framing | Credit 2-2x14 deck joists. | 52 | -86.32 | -4,488.64 |
| 06/28/2023 | 4.1 - Rough Framing | Credit (2) 4x14 beams. | 2 | -133.68 | -267.36 |
| 06/28/2023 | 4.1 - Rough Framing | Added 2x8 roof rafters at former deck. | 28 | 33.24 | 930.72 |
| 06/28/2023 | 4.1 - Rough Framing | Added 2x8 ceiling joists at former deck. | 28 | 33.24 | 930.72 |
| 06/28/2023 | 4.1 - Rough Framing | Add asphalt shingles to the new pitched roof. | 1 | 1,400.00 | 1,400.00 |
| 06/28/2023 | 11.6 - Low Impact Development | Install Rain Barrels at rear of structure. | 1 | 0.00 | 0.00 |
| 06/28/2023 | 11.6 - Low Impact Development | Install downspouts that lead to rear of structure. | 1 | 0.00 | 0.00 |
| 06/28/2023 | 11.6 - Low Impact Development | Reroute PVC lines from rain barrels to existing curb. | 1 | 0.00 | 0.00 |
| 06/28/2023 | 8.1 - Windows & Siding Doors | Install windows in the ADU. | 1 | 2,200.00 | 2,200.00 |
| 06/28/2023 | 8.1 - Windows & Siding Doors | Install windows in the Addition and add sill plate. | 1 | 300.00 | 300.00 |
| 06/28/2023 | 4.1 - Rough Framing | Framed laundry room for the main residence. | 1 | 250.00 | 250.00 |
| 06/28/2023 | 4.1 - Rough Framing | Revised the kitchen layout and added 1-hr fire wall to laundry room. | 1 | 840.00 | 840.00 |
| 06/28/2023 | 12.1 - Rough Plumbing | Reroute existing plumbing lines that conflict with proposed windows. | 1 | 120.00 | 120.00 |
| 06/28/2023 | 4.1 - Rough Framing | Demo existing stairs and increase the width. | 1 | 0.00 | 0.00 |
| 06/28/2023 | 4.1 - Rough Framing | Extend floor joists and add (2) 4x12 beams to increase landing. | 1 | 0.00 | 0.00 |
| 06/28/2023 | 4.1 - Rough Framing | Revised the location of the landing concrete pad for the increased landing. | 1 | 200.00 | 200.00 |
| 06/28/2023 | 4.1 - Rough Framing | Framed Arch along the living room. | 1 | 400.00 | 400.00 |
| 06/28/2023 | 4.1 - Rough Framing | Framed (2) 40" doors for entry and laundry room. | 2 | 140.00 | 280.00 |
| 06/28/2023 | 4.1 - Rough Framing | Framed changes along the hallway addition. | 1 | 200.00 | 200.00 |
| 06/28/2023 | 3.2 - Concrete & Concrete Pumping | Added (2) exterior pad footings for new beams. | 1 | 0.00 | 0.00 |
| 06/28/2023 | 4.1 - Rough Framing | Added (1) interior combined footing pad to catch a new header. | 1 | 1,800.00 | 1,800.00 |
| 06/28/2023 | 4.1 - Rough Framing | Added a 7x11-1/4 PSL beam along the living room. | 1 | 986.81 | 986.81 |
| 06/28/2023 | 4.1 - Rough Framing | Added a 5.25x11.25 PSL beam to carry the existing unit above. | 1 | 1,013.40 | 1,013.40 |
| 06/28/2023 | 4.1 - Rough | Added a 3.5x9.5 PSL header to carry | 1 | 76.36 | 76.36 |

| DATE | | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|---|
| | Framing | the new PSL beam above. | | | |
| 06/28/2023 | 4.1 - Rough Framing | Added a 5.25x11.25 PSL to carry the other half of the existing unit above. | 1 | 709.38 | 709.38 |
| 06/28/2023 | 4.1 - Rough Framing | Added a 7x11.25 PSL beam to carry the two new 5.25x11.25 PSL beams. | 1 | 1,013.40 | 1,013.40 |
| 06/28/2023 | 4.1 - Rough Framing | Added a new 4x12 beam to carry the bearing wall above. | 1 | 84.42 | 84.42 |
| 06/28/2023 | 4.1 - Rough Framing | Added a new 5.25x11.25 PSL beam to carry the shear wall above. | 1 | 709.38 | 709.38 |
| 06/28/2023 | 4.1 - Rough Framing | Increased the landing beams from 4x10 to 4x12. | 1 | 0.00 | 0.00 |
| 06/28/2023 | 4.1 - Rough Framing | Framed wall to eliminate entry to the former deck. | 1 | 80.00 | 80.00 |
| 06/28/2023 | 4.1 - Rough Framing | Added numerous column caps and hardware to connect additional beams. | 6 | 320.00 | 1,920.00 |
| 06/28/2023 | 2.3 - Deputy Inspections | Diaphragm deputy inspection, per inspector mandate. | 1 | 350.00 | 350.00 |
| 06/26/2023 | 2.3 - Deputy Inspections | Shear wall deputy inspection, per inspector mandate. | 1 | 350.00 | 350.00 |
| 06/28/2023 | 12.1 - Rough Plumbing | Installed new tankless water heater to upstairs unit. | 1 | 300.00 | 300.00 |
| 06/28/2023 | 13. HVAC | Install new mini-splits to upstairs unit, per revised Title 24. | 1 | 0.00 | 0.00 |
| 06/28/2023 | 5.1 - Rough Electrical | Remove existing electrical panel. | 1 | 0.00 | 0.00 |
| 06/28/2023 | 5.1 - Rough Electrical | Upgrade new electrical panel per DWP meter spot. | 1 | 0.00 | 0.00 |
| 06/28/2023 | 5.1 - Rough Electrical | Apply for DWP encroachment, per inspector mandate. | 1 | 0.00 | 0.00 |
| 06/28/2023 | 4.1 - Rough Framing | Create a soffit for upstairs plumbing lines. | 1 | 140.00 | 140.00 |
| 06/28/2023 | 4.1 - Rough Framing | Frame enclosure for A/C condenser. | 1 | 80.00 | 80.00 |
| 06/28/2023 | 11.6 - Low Impact Development | Install new LID landscape at the rear of structure. | 1 | 0.00 | 0.00 |
| 06/28/2023 | 3.2 - Concrete & Concrete Pumping | Epoxy new concrete pads to existing poured concrete. | 1 | 220.00 | 220.00 |
| 06/28/2023 | Structural Observation | Structural observation reports for foundation & framing. | 2 | 400.00 | 800.00 |
| 06/28/2023 | 4.1 - Rough Framing | Installed new shoring wall to support unit above while installing new PSL beam. | 1 | 480.00 | 480.00 |
| 06/28/2023 | 3.1 - Formwork/Footings | Revised formwork to account for surveyor's report. | 1 | 120.00 | 120.00 |
| 06/28/2023 | 4.1 - Rough Framing | Pressure-treated eaves | 1 | 440.00 | 440.00 |
| 06/28/2023 | 5.1 - Rough Electrical | Outlet for chandelier | 1 | 60.00 | 60.00 |
| 06/28/2023 | 5.1 - Rough Electrical | New lights at Arch | 2 | 80.00 | 160.00 |

Thank you for your business!

TOTAL **USD 16,094.84**

Accepted By

Accepted Date

Thank you for your business!

# EXHIBIT 4

# ɔs Angeles Department of Building and Safety

## :ertificate Information: 5316-5318 1/2 S ASCOT AVE 90011

**ɔplication / Permit**
21014-10000-04147

**an Check / Job No.**
B21LA15231

**'oup**
Building

**'pe**
Bldg-Addition

**ıb-Type**
1 or 2 Family Dwelling

**imary Use**
(1) Accessory Dwelling Unit

**ork Description**
1184 SF Addition of Attached ADU per Ordinance and LAMC 12.22A33(c)&(e) with 320 SF Addition to existing Duplex.

**:rmit Issued**
Issued on 12/20/2022

**suing Office**
Metro

**ırrent Status**
Issued on 12/20/2022

**:rtificate of Occupancy**
Pending

### :rmit Application Status History

| | | |
|---|---|---|
| ɹbmitted | 8/20/2021 | APPLICANT |
| ssigned to Plan Check Engineer | 9/22/2021 | ZAW HAN |
| ɔrrections Issued | 9/30/2021 | ZAW HAN |
| :viewed by Supervisor | 10/4/2021 | KEN GILL |
| ɹilding Plans Picked Up | 10/7/2021 | APPLICANT |
| ɔplicant returned to address corrections | 4/13/2022 | ZAW HAN |
| an Check Approved | 5/2/2022 | ZAW HAN |
| sued | 12/20/2022 | APPLICANT |

### :rmit Application Clearance Information

| | | | |
|---|---|---|---|
| ddress approval | Cleared | 11/5/2021 | CINDY QI |
| ghway dedication | Cleared | 11/5/2021 | CINDY QI |
| ıg Process Fee Ord 176,300 | Cleared | 2/22/2022 | CINDY QI |
| :wer availability | Cleared | 2/22/2022 | CINDY QI |
| ıw Impact Development | Cleared | 3/3/2022 | SARAH YOUSSEF |
| ɔof/Waste drainage to street | Cleared | 3/8/2022 | CINDY QI |
| 'een Code | Cleared | 4/13/2022 | ZAW HAN |

### ɔntact Information

| | | |
|---|---|---|
| chitect | Deonihan,, John Gilmore; Lic. No.: C9147 | 5931 OAKDALE AVENUE WOODLAND HILLS, CA 91367 |
| ɔntractor | Ivy Green Construction; Lic. No.: 1014647-B | 14537 VENTURA BLVD SHERMAN OAKS, CA 91403 |
| ıgineer | Li,, Dacheng David; Lic. No.: C58075 | 1400 N KRAEMER BLVD #712 PLACENTIA, CA 92781 |

### ɪspector Information

.EJANDRO DE ARTOLA, (213) 202-3128 — Office Hours: 7:00-8:00 AM MON-FRI

### nding Inspections

| | |
|---|---|
| ısonry Wall/Backfill | 8/4/2023 |

| | |
|---|---|
| PLUMBING-Rough | 8/4/2023 |
| Floor/Roof Diaphrgm/Shear Wall | 8/4/2023 |
| PLUMBING-Final | 8/4/2023 |
| Insulation | 8/4/2023 |
| Drywall Nailing | 8/4/2023 |
| Green Building Rough | 8/4/2023 |
| Special/Order Compliance | 8/4/2023 |

## Inspection Request History

| | | | |
|---|---|---|---|
| Excavation/Setback/Form/Re-Bar | 1/26/2023 | Corrections Issued | BRENDAN MORELLI |
| Footing/Foundation/Slab | 1/26/2023 | Corrections Issued | BRENDAN MORELLI |
| PLUMBING-Rough | 1/26/2023 | Corrections Issued | BRENDAN MORELLI |
| Underground Mechanical | 1/26/2023 | Corrections Issued | BRENDAN MORELLI |
| Deputy Drilled-In Anchors | 1/30/2023 | Conditional Approval | BRENDAN MORELLI |
| Excavation/Setback/Form/Re-Bar | 1/31/2023 | Corrections Issued | BRENDAN MORELLI |
| PLUMBING-Rough | 1/31/2023 | Partial Approval | BRENDAN MORELLI |
| Excavation/Setback/Form/Re-Bar | 4/28/2023 | Approved | BRENDAN MORELLI |
| Floor/Roof Diaphrgm/Shear Wall | 4/28/2023 | Corrections Issued | BRENDAN MORELLI |
| Floor/Roof Diaphrgm/Shear Wall | 5/4/2023 | Corrections Issued | BRENDAN MORELLI |
| Deputy Wood Construction | 5/10/2023 | Conditional Approval | BRENDAN MORELLI |
| Floor/Roof Diaphrgm/Shear Wall | 5/22/2023 | Corrections Issued | BRENDAN MORELLI |
| ELECTRICAL-Rough | 6/14/2023 | Not Ready for Inspection | BRENDAN MORELLI |
| Gas Test | 6/14/2023 | Partial Approval | BRENDAN MORELLI |
| PLUMBING-Rough | 6/14/2023 | Not Ready for Inspection | BRENDAN MORELLI |
| Deputy Wood Construction | 6/23/2023 | Approved | DONALD CRICHLOW |
| Floor/Roof Diaphrgm/Shear Wall | 6/26/2023 | Conditional Approval | BRENDAN MORELLI |
| Footing/Foundation/Slab | 6/26/2023 | Corrections Issued | BRENDAN MORELLI |
| Floor/Roof Diaphrgm/Shear Wall | 6/29/2023 | Partial Approval | ALIZAH MAYAGOITIA |
| Footing/Foundation/Slab | 6/29/2023 | Approved | ALIZAH MAYAGOITIA |
| Green Building Rough | 6/29/2023 | Not Ready for Inspection | ALIZAH MAYAGOITIA |
| PLUMBING-Rough | 6/29/2023 | Approved | ALIZAH MAYAGOITIA |
| Rough-Elec/Plmb/HVAC | 6/29/2023 | Corrections Issued | ALIZAH MAYAGOITIA |
| ELECTRICAL-Rough | 7/6/2023 | Corrections Issued | BRENDAN MORELLI |
| HVAC-Rough | 7/6/2023 | Corrections Issued | BRENDAN MORELLI |
| Insulation | 7/6/2023 | Partial Approval | BRENDAN MORELLI |
| Interior/Exterior Lathing | 7/6/2023 | Not Ready for Inspection | BRENDAN MORELLI |
| Deputy Wood Construction | 7/25/2023 | Conditional Approval | ALEJANDRO DE ARTOLA |

# os Angeles Department of Building and Safety

## :ertificate Information: 5316-5318 1/2 S ASCOT AVE 90011

**pplication / Permit**
21014-10001-04147

**lan Check / Job No.**
B23LA09125

**roup**
Building

**ype**
Bldg-Alter/Repair

**ub-Type**
1 or 2 Family Dwelling

**rimary Use**
(2) Duplex

**'ork Description**
Supplemental to 21014-10000-04147 for the revision of Rain barrels and replace roof deck with pitched roof and revision of side yard setbacks to 4'6" and 5'6" respectively per Survey and Field Conditions.

**ermit Issued**
Issued on 6/20/2023

**suing Office**

**urrent Status**
Issued on 6/20/2023

**ertificate of Occupancy**
Pending

### ermit Application Status History

| | | |
|---|---|---|
| ubmitted | 5/16/2023 | APPLICANT |
| ssigned to Plan Check Engineer | 5/16/2023 | ZAW HAN |
| :orrections Issued | 5/22/2023 | ZAW HAN |
| 'lan Check Approved | 6/20/2023 | ZAW HAN |
| ssued | 6/20/2023 | APPLICANT |

### ermit Application Clearance Information

| | | | |
|---|---|---|---|
| ow Impact Development (LID) | Cleared | 5/25/2023 | ROGELIO CORTES |
| oof/Waste drainage to street | Cleared | 6/4/2023 | AHMED AMARRAGY |
| ng Process Fee Ord 176,300 | Cleared | 6/8/2023 | HUGO LOPEZ |

### ontact Information

| | | | |
|---|---|---|---|
| rchitect | Deenihan,, John Gilmore; Lic. No.: C9147 | 5931 OAKDALE AVENUE | WOODLAND HILLS, CA 91367 |
| :ontractor | Ivy Green Construction; Lic. No.: 1014647-B | 14537 VENTURA BLVD | SHERMAN OAKS, CA 91403 |
| ngineer | Li,, Dacheng David; Lic. No.: C58075 | 1400 N KRAEMER BLVD #712 | PLACENTIA, CA 92781 |
| ngineer | Valencia,, Byron Steve; Lic. No.: C87372 | 14537 VENTURA BLVD | SHERMAN OAKS, CA 91403 |
| ngineer | Wright,, Reynolds Christopher; Lic. No.: L7762 | 74711 DILLON RD 399 | DESERT HOT SPRINGS, CA 92241 |

### spector Information

LEJANDRO DE ARTOLA (213) 202-3128 Office Hours: 7:00-8:00 AM MON-FRI

### ending Inspections

o Data Available.

### spection Request History

| | | | |
|---|---|---|---|
| 'oor/Roof Diaphrgm/Shear Wall | 7/17/2023 | Not Ready for Inspection | BRENDAN MORELLI |
| terior/Exterior Lathing | 7/17/2023 | Approved X X | BRENDAN MORELLI |
| 'ood Frame | 7/17/2023 | Not Ready for Inspection | BRENDAN MORELLI |

# .os Angeles Department of Building and Safety

## Permit Information: 5316-5318 1/2 S ASCOT AVE 90011

Certificate Of Occupancy Details

**Certificate Number**
248515
**Current Status**
Pending - 01/26/2023 Brendan Morelli (213) 202-3128
**Associated Permits**
21014-10000-04147, 21014-10001-04147, 21014-10002-04147

## CofO Inspection:

| | |
|---|---|
| Building Verification | Not Applicable |
| BMI Verification | Pending |
| Electrical Verification | Pending |
| Elevator Verification | Not Applicable |
| Fire Sprinkler Verification | Not Applicable |
| Grading Verification | Not Applicable |
| Heat,Vent,A/C Verification | Pending |
| Plumbing Verification | Pending |
| Pressure Vessel Verification | Not Applicable |
| AIM Verification | Not Applicable |

## City Department approvals required prior to the issuance of a Certificate of Occupancy:

| | |
|---|---|
| Public Works | Pending |
| HCIDLA Housing Dept | OK for CofO |
| LAFD | OK for CofO |
| Rec and Parks | Pending |
| Air Quality Management District | OK for CofO |

# .os Angeles Department of Building and Safety

## Certificate Information: 5316-5318 1/2 S ASCOT AVE 90011

**Application / Permit**
21014-10000-04147

**Plan Check / Job No.**
B21LA15231

**Group**
Building

**Type**
Bldg-Addition

**Sub-Type**
1 or 2 Family Dwelling

**Primary Use**
(1) Accessory Dwelling Unit

**Work Description**
1184 SF Addition of Attached ADU per Ordinance and LAMC 12.22A33(c)&(e) with 320 SF Addition to existing Duplex.

**Permit Issued**
Issued on 12/20/2022

**Issuing Office**
Metro

**Current Status**
Issued on 12/20/2022

**Certificate of Occupancy**
Pending

### Permit Application Status History

| | | |
|---|---|---|
| Submitted | 8/20/2021 | APPLICANT |
| Assigned to Plan Check Engineer | 9/22/2021 | ZAW HAN |
| Corrections Issued | 9/30/2021 | ZAW HAN |
| Reviewed by Supervisor | 10/4/2021 | KEN GILL |
| Building Plans Picked Up | 10/7/2021 | APPLICANT |
| Applicant returned to address corrections | 4/13/2022 | ZAW HAN |
| Plan Check Approved | 5/2/2022 | ZAW HAN |
| Issued | 12/20/2022 | APPLICANT |

### Permit Application Clearance Information

| | | | |
|---|---|---|---|
| Address approval | Cleared | 11/5/2021 | CINDY QI |
| Highway dedication | Cleared | 11/5/2021 | CINDY QI |
| Eng Process Fee Ord 176,300 | Cleared | 2/22/2022 | CINDY QI |
| Sewer availability | Cleared | 2/22/2022 | CINDY QI |
| Low Impact Development | Cleared | 3/3/2022 | SARAH YOUSSEF |
| Roof/Waste drainage to street | Cleared | 3/8/2022 | CINDY QI |
| Green Code | Cleared | 4/13/2022 | ZAW HAN |

### Contact Information

| | | | |
|---|---|---|---|
| Architect | Doonihan,, John Gilmore; Lic. No.: C9147 | 5931 OAKDALE AVENUE | WOODLAND HILLS, CA 91367 |
| Contractor | Ivy Green Construction; Lic. No.: 1014647-B | 14537 VENTURA BLVD | SHERMAN OAKS, CA 91403 |
| Engineer | Li,, Dacheng David; Lic. No.: C58075 | 1400 N KRAEMER BLVD #712 | PLACENTIA, CA 92781 |

### Inspector Information

BRENDAN MORELLI, (213) 202-3128 — Office Hours: 7:00-8:00 AM MON-FRI

### Pending Inspections

No Data Available.

# EXHIBIT 5

11:27

◀ Messages

LA DBS
DEPARTMENT OF BUILDING AND SAFETY

All Services

of Occupancy:

Public Works — Pending

| Date | Description | Status | Phone | Comment |
|---|---|---|---|---|
| 01/26/2023 | Public Works-Flood | Not Applicable | | |
| 01/26/2023 | Public Works-Highway Ded. | Pending | | |
| 01/26/2023 | Public Works-Open Permits | Pending | | |
| 01/26/2023 | Public Works-Stormwater | Not Applicable | | |
| 01/26/2023 | Public Works-Sewers | Pending | | |

HCIDLA Housing Dept — OK for CofO

LAFD — OK for CofO

Rec and Parks — Pending

Air Quality Management District — OK for CofO

AA ices2.lacity.org

# EXHIBIT 6

5/26/23

planos

Balance.

MARTIN VILLALOBOS SR
ROSA MIRIAM VILLALOBOS
POD IRMA VILLALOBOS
5316 ASCOT AVE
LOS ANGELES CA 90011-4912

1946
11-35/1210 CA
90508

Date 5/26/23

Pay To The Order Of IVy GreeN ConsTruction $1,236.

ONe Thousand Two Hundred-Thirty SIX Dollars

Photo Safe Deposit® Details on back

BANK OF AMERICA

ACH R/T 121000358

For IVy GreeN Construction Rosa Villalobos

[redacted]

Harland Clarke

3/2/23

Planos y Gastos
Extras.

MARTIN VILLALOBOS SR
ROSA MIRIAM VILLALOBOS
POD IRMA VILLALOBOS
5316 ASCOT AVE
LOS ANGELES CA 90011-4912

1904
11-35/1210 CA
90508

3/2/23 -
Date

Pay To The Order Of IVY Green Construction $ 3,485.59

Three Thausand Four Handred Eiety Five 59/100 Dollars

Photo Safe Deposit® Details on back

BANK OF AMERICA

ACH R/T 121000358

Planos y Estras.

For IVY Green Construction paid. Rosa Villalobos MP

[redacted]

Harland Clarke

# EXHIBIT 7






Un-Faced Insul






MOISTOP
MOISTOP





